## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| TYSON MANKER, on behalf of himself and all others similarly situated, and NATIONAL VETERANS COUNCIL FOR LEGAL REDRESS, on behalf of itself, its members, and all others similarly situated, | No. _____ |
| *Plaintiffs*, | |
| v. | March 2, 2018 |
| RICHARD V. SPENCER, Secretary of the Navy, | |
| *Defendant*. | |

## **COMPLAINT**

Since the September 11th attacks, thousands of Marines and Sailors have deployed to combat zones across the globe and returned home suffering invisible wounds of war. Instead of receiving the mental health treatment they deserved, many of these service members were separated from the military with less-than-Honorable discharges due to minor infractions attributable to the effects of wartime trauma.  These veterans are permanently stigmatized and barred from accessing essential benefits like the GI bill and much-needed mental health care.

Congress established Discharge Review Boards during World War II to allow veterans improperly or inequitably discharged from the United States military the opportunity to seek relief from such wrongful punishment. In establishing these Boards, Congress recognized that disciplinary decisions made in the heat of battle should not necessarily be life sentences for young veterans with less-than-Honorable discharges.

1

Yet, the Naval Discharge Review Board (NDRB), which adjudicates applications from Navy and Marine Corps veterans seeking to upgrade their less-than-Honorable discharges, rejects the petitions of nearly all who apply. The NDRB does so without clearly explaining what a veteran must show to prevail and without applying the proper legal standards. Tyson Manker and the National Veterans Council for Legal Redress (NVCLR) thus bring this class action on behalf of Navy and Marine Corps veterans who continue to be unlawfully denied discharge upgrades.

Tyson Manker served his country with distinction from 1999 until 2003. At just twenty-one years old, Mr. Manker was already a Non-Commissoned Officer, leading infantry Marines in the invasion of Iraq. After experiencing intense combat—and the death of his close friend and squad mate—Mr. Manker began struggling with common symptoms of Post-Traumatic Stress Disorder (PTSD), such as nightmares and hypervigilance. Once back home, these symptoms worsened. He experienced severe anxiety and rapid mood swings and, like many with PTSD, he self-medicated with an illegal drug. For this single incident of self-medication, Mr. Manker received an Other-than-Honorable (OTH) discharge.

NVCLR is a membership-based organization located in New Haven, Connecticut that serves and advocates for veterans with less-than-Honorable discharges. Its members include Mr. Manker and John Doe, who volunteered to serve their nation, yet experience hardship due to their less-than-Honorable discharges. Mr. Doe is a Connecticut resident who served in the U.S. Marine Corps. Like Mr. Manker, Mr. Doe experienced the harsh realities of combat in Iraq, where his unit was also part of the initial invasion. After serving with distinction, he too returned home with tell-tale signs of PTSD. Mr. Doe suffered from nightmares, memory loss, and severe anxiety. His behavior became erratic, and he turned to alcohol to ease his symptoms. Just months

2

after returning from Iraq, Mr. Doe was disciplined for unauthorized absence and for failure to obey an order, and was subsequently discharged with an Other-than-Honorable status.

Both Mr. Manker and Mr. Doe applied to the NDRB for upgrades to Honorable discharges after recognizing that PTSD caused the erratic behavior for which they were discharged. They had reason to be optimistic: the law requires the NDRB to give "liberal" or "special" consideration to discharge upgrade applications based on credible claims of service-connected PTSD, and Mr. Manker and Mr. Doe's applications provided clear evidence of mitigating service-connected PTSD. Nevertheless, the NDRB denied their petitions. What neither Mr. Manker nor Mr. Doe knew at the time was that the NDRB denies almost 90 percent of applications alleging PTSD or PTSD-related conditions.

The NDRB violates the Administrative Procedure Act by issuing decisions that are arbitrary and capricious, inconsistent with relevant statutory law, and deprive applicants of their Fifth Amendment rights to due process of law. The NDRB's actions in contravention of binding Department of Defense guidance indicate an unconstitutional secret policy against granting discharge upgrades, which sets an unachievable and sometimes unknown evidentiary burden for applicants alleging PTSD as a basis for a discharge upgrade.

On behalf of themselves, NVCLR's members, and others similarly situated, Mr. Manker and NVCLR ask the Court to set aside and hold unlawful the NDRB's improper denials of their discharge upgrade applications. They request that this Court order the approval of the discharge upgrade applications of Mr. Manker and NVCLR's members, so that their records may finally reflect the true character of their service. Finally, Plaintiffs ask the Court to issue appropriate injunctive relief to ensure that all Navy and Marine Corps veterans may have their discharge upgrade applications considered according to the Constitution and as intended by Congress.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the Administrative Procedure Act, 5 U.S.C. § 706.

2.      Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(C). Plaintiff NVCLR is a Connecticut corporation with a primary place of business in the District of Connecticut. Most of its members, including Mr. Doe, reside in Connecticut. No real property is involved in the action. Defendant Richard V. Spencer is sued in his official capacity as an officer of the United States.

## PARTIES

3.      NVCLR is a New Haven, Connecticut-based membership organization that consists of veterans of the U.S. Armed Forces, including Tyson Manker and John Doe. NVCLR seeks to assist veterans with less-than-Honorable discharges and to educate the public about issues confronted by these veterans. Most of its members, including Mr. Doe, reside in Connecticut.

4.      Tyson Manker is an Illinois resident and veteran of the U.S. Marine Corps.

5.      Defendant Richard V. Spencer, Secretary of the Navy, is sued in his official capacity. Congress has authorized the Secretary of the Navy, acting through the NDRB, to correct the improper or inequitable discharge of any former member of the Navy or Marine Corps. 10 U.S.C. § 1553(a); 32 C.F.R. § 70.9.

## REGULATORY BACKGROUND

6.      Upon discharge from the U.S. Armed Forces, military personnel receive a certificate that characterizes their service as Honorable, General (Under Honorable Conditions), Other than Honorable, Bad Conduct, or Dishonorable. 32 C.F.R. §§ 724.109, 724.111.

7.      The discharge characterization affects each veteran's eligibility for benefits and support services administered by the U.S. Department of Veterans Affairs (VA), *see, e.g.*, 38 U.S.C. § 101(2); 38 C.F.R. § 3.12, as well as benefits and services provided by state laws.

8.      To receive VA education benefits and services through the Post-9/11 GI Bill program, a veteran must receive an Honorable discharge or be discharged or released for a service-connected disability. 38 U.S.C. §§ 3311(b)–(c).

9.      The NDRB reviews discharges for propriety and equity. 32 C.F.R. § 70.9.

10.     A veteran applying for a discharge upgrade at the NDRB has a right to two types of review: a documentary records review and a personal appearance hearing. *Id.* § 70.8(b)(3).

11.     On September 3, 2014, then-Secretary of Defense Chuck Hagel directed all records-correction boards to give "special consideration" to PTSD diagnoses by the VA and "liberal consideration" to diagnoses of PTSD by civilian providers when adjudicating discharge upgrade applications submitted by veterans who have been diagnosed with PTSD. Ex. 1, Memorandum from Chuck Hagel, Secretary of Defense (Sept. 3, 2014) ("Hagel Memo").

12.     The Hagel Memo also directs military review boards to consider PTSD and "PTSD-related conditions" as "potential mitigating factors in the misconduct that caused the under other than honorable conditions characterization of service." *Id.*

13.     In 2016 Congress codified parts of the Hagel Memo. The Discharge Review Boards are now statutorily required to grant "liberal consideration" to the discharge upgrade applications of veterans with symptoms related to PTSD or traumatic brain injury (TBI). 10 U.S.C. § 1553(d)(3)(A)(ii). In particular, the Discharge Review Boards are mandated to review each case "with liberal consideration to the former member that post-traumatic stress disorder or

traumatic brain injury potentially contributed to the circumstances resulting in the discharge of a lesser characterization." *Id.*

14.     On August 25, 2017, citing a determination "that clarifications are needed regarding mental health conditions," Acting Under Secretary of Defense for Personnel and Readiness Anthony M. Kurta issued additional guidance clarifying that "[l]iberal consideration will be given to veterans petitioning for discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions." Ex. 2, Memorandum from A.M. Kurta, Acting Under Secretary of Defense for Personnel and Readiness (Aug. 25, 2017) ("Kurta Memo").

15.     The NDRB must respond to all issues relevant to the decision whether to change the character of or reason for discharge. 32 C.F.R. § 70.8(d); DoD Instruction 1332.28, Discharge Review Board Procedures and Standards (April 4, 2004).

16.     When the NDRB makes a factual determination after considering contradictory evidence in the record, it must explain in its decision "why the information relied upon was more persuasive than the information that was rejected." *Id.*

17.     The NDRB applies a "presumption of regularity in the conduct of governmental affairs," which can be overcome by "substantial credible evidence." *Id.* at § E3.2.12.6.

18.     When the NDRB decides an application in part on the truth of a certain event or circumstance, it is required by Department of Defense regulations to "make a finding of fact for each such event or circumstance." *Id.* at § E3.5.3.2.2.

19.     While the NDRB may rely on the presumption of regularity in making this finding of fact, "the decisional document shall set forth the basis for relying on the presumption

of regularity and explain the reasons the contradictory evidence was insufficient to overcome the presumption." *Id.* at § E3.5.3.2.2.2.

20.     The Boards for Correction of Military/Naval Records may also correct military records. 10 U.S.C. § 1552. The statute does not require a veteran to apply to both boards prior to seeking judicial review, nor does it establish any sort of internal appeals process. *Id.*

21.     Federal courts may review NDRB decisions as final agency actions under the Administrative Procedure Act. 5 U.S.C. §§ 702-06.

22.     The Navy and other administrative agencies are responsible for maintaining records for a variety of official purposes, including judicial review of agency action. 5 U.S.C. § 552a(e)(5); 44 U.S.C. §§ 3101, 3301.

23.     The NDRB must also make all decisional documents available for inspection and review by the public. 32 C.F.R. § 724.810. Only names, addresses, social security numbers, and military service numbers may be redacted without written justification. 32 C.F.R. § 724.810(b).

24.     These decisional documents must be indexed and in a usable and concise form "so as to enable the public, and those who represent applicants before the NDRB, to isolate from all these decisions that are indexed, those cases that may be similar to an applicant's case and that indicate the circumstances under or reasons for (or both) which the NDRB or the Secretary concerned granted or denied relief." 32 C.F.R. § 724.810(d).

## FACTS AND PROCEEDINGS

### Allegations as to Class Representative Tyson Manker

25.     Tyson Manker was born in 1981 and grew up in Jacksonville, Illinois, where he currently lives and works as an attorney.

26.     Mr. Manker enlisted in the Marine Corps in December 1999 at the age of 18, and began basic training in August 2000.

27.     Mr. Manker was initially stationed at Marine Corps Base Camp Pendleton near San Diego, where he completed advanced weapons training as an 0341 Infantry Mortarman at the School of Infantry.

28.     Mr. Manker's first assignment was to the Weapons Company, 1st Battalion, 7th Marine Regiment, at the Marine Corps Air Ground Combat Center (MCAGCC) in Twentynine Palms, California, from January 2001 until September 2002. In May 2001, Mr. Manker was promoted to the rank of Lance Corporal after just 9 months of service.

29.     Mr. Manker deployed to Okinawa, Japan, in February 2002. During his service in Japan, Mr. Manker and other members of his unit received the Navy Unit Commendation, although Mr. Manker's discharge paperwork erroneously omits this citation.

30.     During his deployment to Japan, Mr. Manker was promoted again, to the rank of Corporal. He was the first in his platoon to achieve Non-Commissioned Officer status.

31.     In August 2002, upon his return to the United States, Mr. Manker transferred from the 1st Battalion to the 3rd Battalion, 7th Marine Regiment.

32.     In January 2003, his new unit was sent to Kuwait as part of Operation Iraqi Freedom. After two months of training, on March 21, 2003, Mr. Manker's unit led the United States' invasion into Iraq. He was twenty-one years old.

33.     As Mr. Manker's unit crossed the Kuwaiti border into Iraq, they fought through enemy forces to establish a base in Baghdad. There, they conducted patrols and raids in search of weapons caches and insurgent groups.

34.     On his way into Baghdad, Mr. Manker's convoy of Assault Amphibious Vehicles (AAVs) encountered land mines laid across the road. Mr. Manker's vehicle circumvented the

mines, but the AAV behind him ran over a mine and was blown up. The force of the explosion knocked Mr. Manker off his feet and threw him down to the lower level of his vehicle.

35.     When Mr. Manker's platoon entered Baghdad, they were immediately ambushed in a park. Mr. Manker captured two enemy soldiers before rejoining a group engaged in a shootout nearby. During the shootout, Mr. Manker fired over thirty rounds, emptying and reloading his magazine, and saw numerous enemy and civilian casualties.

36.     The night after the ambush, Mr. Manker led two squads on a night foot patrol back through the same park to check for enemy forces. He saw dismembered bodies that had been hit by grenade launchers during the siege. Mr. Manker spotted a stray AK-47 beneath a headless torso. He had to move the corpse to collect the weapon in order to prevent it from falling back into enemy hands.

37.     After one week in Baghdad, Mr. Manker's unit moved to Karbala, where it conducted patrols and raids and staffed checkpoints. The Battalion Commander often designated Mr. Manker's platoon the Quick Reaction Force (QRF), which was responsible for providing nearby units with emergency reinforcements in case of unexpected engagements with the enemy. Mr. Manker's superiors selected him to be a squad leader with the QRF. In this role, he led a team of 13 Marines on dozens of foot and vehicle patrols.

38.     In one QRF encounter, Mr. Manker and his squad responded to reports of two enemy trucks full of materials for making improvised explosive devices, including artillery shells. Mr. Manker chased after the vehicles, stopping one at gunpoint and subduing the passenger after hand-to-hand combat. When he caught up to the second truck, Mr. Manker shot at what he thought was an armed insurgent fleeing the truck. After he moved closer, he discovered that person was a teenage girl.

9

39.     Mr. Manker suffered multiple concussive blasts during his deployment. He was a mortar gunner, so he fired hundreds of rounds, each of which caused a subconcussive blast.

40.     In June 2003, in Karbala, Mr. Manker witnessed the death of his close friend, Navy Corpsman Joshua McIntosh. Mr. McIntosh accidentally discharged his firearm, shooting himself in the head. Mr. Manker helped load his body onto a stretcher for transport and was later personally responsible for cleaning his friend's remains.

41.     While staffing checkpoints and roadblocks, Mr. Manker saw multiple civilians shot and killed. He particularly remembers one civilian who asked for his mother while being rushed to the hospital after being shot dozens of times.

42.     Towards the end of his deployment, while still in Iraq, Mr. Manker filled out a Post-Deployment Health Assessment (PDHA) form. His responses indicated that already he was beginning to show risk factors for and symptoms of PTSD and traumatic brain injury (TBI).

43.     On this form, he reported that during his service he had feared for his life; had discharged his weapon in direct ground combat; had seen fellow service members, enemy fighters, and civilians wounded and killed; had experienced nightmares and hypervigilance; and had been involved in inspecting destroyed military vehicles.

44.     Despite these clear indications of symptoms of and risk factors for PTSD on Mr. Manker's PDHA, Marine Corps staff did not refer Mr. Manker for treatment or any further evaluation.

45.     Mr. Manker's unit returned to the United States in September 2003.

46.     For their bravery and exceptional service, Mr. Manker's unit received the rarely-awarded Presidential Unit Citation, given to service members who, as a unit, have shown "extraordinary heroism in action against an armed enemy" and "gallantry, determination and

esprit de corps in accomplishing [their] mission under extremely difficult and hazardous conditions."

47.     Mr. Manker was also awarded the Combat Action Ribbon, which is awarded to Navy and Marine service members of rank Colonel and below who personally fought in active ground combat under enemy fire.

48.     Mr. Manker also received the National Defense Service Medal and the Sea Service Deployment Ribbon.

49.     Mr. Manker received consistently favorable Proficency and Conduct marks throughout his time in the Marines.

50.     In his final two evaluations, both given during his combat deployment, Mr. Manker received an average Proficiency mark of 4.6 out of 5 and an average Conduct mark of 4.5 out of 5, both denoting "Excellent" performance. Marine Corps Individual Records Administration Manual § 4005.

51.     Immediately upon his return to the United States in September 2003, Mr. Manker learned that his parents had separated during his deployment to Iraq.

52.     Already dealing with symptoms of PTSD and TBI from his time in combat, Mr. Manker struggled to also handle the news of his father's departure. The night before departing for a month of leave at home, he met up with two junior Marines and smoked marijuana.

53.     During his month of leave, Mr. Manker noticed changes in his behavior. He frequently felt angry, was irritable and tense, drank often, and got into fights.

54.     Upon his return to base, on October 28, 2003, Mr. Manker was nonjudicially charged with use or possession of a controlled substance and failure to prevent two junior service members from using methamphetamine and marijuana.

55.     Contemporaneously, in October 2003, Mr. Manker's superiors gave him a verbal retention warning regarding his self-medicating behavior.

56.     In this conversation with his superiors, Mr. Manker told the truth about his use of illegal drugs to soothe his PTSD symptoms. As a result, his superiors informed him that he would be administratively separated, and he was referred to the Substance Abuse Counseling Center on his base.

57.     The medical assessment found no evidence of substance dependence but did recommend his trauma issues be addressed. They were not.

58.     Mr. Manker was officially discharged with an Other-than-Honorable discharge status on December 19, 2003.

59.     In 2004, shortly after his discharge from the Marine Corps, Mr. Manker moved into his mother's home. Observing that her son exhibited common PTSD symptoms, Ms. Manker insisted that her son seek counseling.

60.     In spring 2004, Mr. Manker attended three sessions with Mr. Ed J. Scott, a private provider and licensed clinical social worker.

61.     Mr. Scott ultimately diagnosed Mr. Manker with PTSD and referred Mr. Manker to the VA hospital for follow-up care.

62.     Mr. Manker immediately contacted the VA Vet Center in Springfield, Illinois, where an employee rebuffed him: "sorry, we don't help OTH vets."

63.     The employee failed to inform Mr. Manker that he could apply for a Character of Service Determination, which, if successful, would enable him to access certain VA health care benefits. Like thousands of fellow veterans with less-than-Honorable discharges, Mr. Manker left his local Vet Center feeling frustrated and dejected.

64.     After his discharge from the military, Mr. Manker continued to experience symptoms of PTSD and TBI. Without access to VA mental health treatment because of his OTH discharge, he self-medicated with drugs and alcohol while contemplating suicide.

65.     In May 2011, after years of untreated PTSD, Mr. Manker knew that he needed help for his mental health condition. He returned to see Mr. Scott, under whose care Mr. Manker began to turn his life around.

66.     In July 2016, Mr. Manker applied for a Character of Service Determination with the VA. Despite his OTH discharge, the VA determined that Mr. Manker's service was "other than dishonorable," making him eligible for a limited set of benefits.

67.     As of December 2017, the VA rates Mr. Manker as 70 percent disabled due to his service-connected PTSD and 10 percent disabled due to service-connected TBI.

68.     Mr. Manker's Other-than-Honorable discharge status does not accurately reflect his exemplary performance in the Marines, evidenced by his multiple commendations for bravery and service. The "serious misconduct" that resulted in Mr. Manker's discharge—using illegal substances while on leave and off of base—was a direct result of his service-connected PTSD and TBI.

69.     Likewise, Mr. Manker's reason for separation—"Misconduct"—does not accurately reflect the character of his service or the mitigating effect of the direct connection between his service-connected PTSD and his substance use.

70.     Mr. Manker felt and continues to feel deeply betrayed by the circumstances of his discharge, and as a result he has struggled with feelings of isolation and stigma in addition to his medical and mental health conditions.

71.     For seven years, he was unable to access vital mental health services and benefits through the VA due to his discharge status, delaying Mr. Manker's ultimate treatment for PTSD and reintegration into civilian life.

72.     As a result of his Other-than-Honorable discharge, Mr. Manker's service is labeled as inferior, even defective—despite his recognized bravery on the front lines of the Iraq invasion.

73.     Since his service, Mr. Manker has committed himself to his personal recovery while  furthering his education and advocating on behalf of other veterans with less-than-Honorable discharges.

74.     After a period of work as a certified motorcycle technician in Dallas, Texas, Mr. Manker returned to his hometown in Illinois. He received an associate's degree in 2009 from Lincoln Land Community College, where he was selected as commencement speaker.

75.     Mr. Manker earned his bachelor's degree in political science, *magna cum laude*, from the University of Illinois Springfield in 2011. He attended Western Michigan University Cooley Law School and graduated with his J.D. in May 2014.

76.     Because of his Other-than-Honorable discharge, Mr. Manker is ineligible for education benefits under the GI Bill, 38 U.S.C. §§ 3301–27. He has paid for his education himself, including trade school, community college, college, and law school.

77.     Mr. Manker is currently a member of the Illinois bar and has been admitted to practice before the U.S. District Court for the Central District of Illinois.

78.     As a citizen and an attorney, Mr. Manker has actively fought and drawn attention to issues of public corruption and official misconduct in his community of Jacksonville, Illinois.

The nonprofit organization Open the Books, which fights for transparency in federal and local government, recognized Mr. Manker's leadership with an Illinois Courage Award in 2015.

79.     Mr. Manker also ran for State's Attorney of Morgan County, Illinois, in 2016.

80.     Mr. Manker has spoken at the United States Capitol on behalf of veterans struggling with PTSD, TBI, and military sexual trauma (MST) and has lobbied for the creation of a Veterans Treatment Court in his community. U.S. Senator Richard Durbin has supported him in this effort.

81.     In 2017, in recognition of his service to the veterans community, High Ground Veterans Advocacy—an advocacy organization focused on the development and empowerment of veterans into effective advocates on military and veterans' issues—honored Mr. Manker as a Veterans Advocacy Fellow.

82.     Despite his many personal accomplishments, Mr. Manker continued to be unfairly stigmatized by his OTH discharge. Mr. Manker applied *pro se* to the NDRB for a records review on June 24, 2016.

83.     He requested that his discharge status be upgraded from Other-than-Honorable to Honorable and that his narrative reason be changed from Misconduct to Completion of Required Active Service.

84.     The NDRB denied his application while making basic errors regarding the factual record.

85.     For example, the NDRB's decision erroneously states that Mr. Manker received a General (Under Honorable Conditions) discharge.

86.     Although Mr. Manker presented documentation to the Board of his two prior diagnoses of PTSD—one by Dr. Jay Liss, a private doctor, and the other by Ed Scott, the treating

therapist whom he saw after he was discharged—the NDRB rejected his discharge upgrade application without affording those diagnoses "liberal consideration." Ex. 3, NDRB Decision No. MD16-01170, Dec. 20, 2016 ("Manker NDRB Decision").

87.     Further ignoring the Hagel Memo's requirements, the Board found that his PTSD did not mitigate his misconduct and, rather, that he made "willful," "conscious decisions to violate the ten[e]ts of honorable and faithful service." *Id.*

88.     The NDRB did not explain why it considered unpersuasive the explanation of Mr. Manker's therapist that his PTSD symptoms played an instrumental role in his decision to use alcohol and drugs after returning from his deployment.

89.     The NDRB also did not explain why it chose to credit Mr. Manker's refusal of treatment, made while still deployed to Iraq, over the subsequent diagnoses of private doctors when weighing the evidence for Mr. Manker's service-connected PTSD.

90.     Mr. Manker answered "No" to the question of whether he was "currently interested in receiving help for a stress, emotional, alcohol, or family problem," and the Board, without explanation, absolved the Marine Corps of responsibility for recommending treatment in the face of the pervasive evidence throughout the PDHA form of Mr. Manker's PTSD symptoms.

91.     The PDHAs were filled out as a group after an officer told the Marines that answering "yes" to requesting help would automatically delay their return home. Mr. Manker did not ask for help.

92.     The NDRB invoked a presumption of governmental regularity in order to dismiss Mr. Manker's claims that the military improperly investigated and adjudicated his drug use. The

NDRB did not explain why the evidence submitted by Mr. Manker failed to rebut the presumption of regularity.

93.     In dismissing Mr. Manker's claims, the NDRB relied on a sworn statement which Mr. Manker allegedly made on October 7, 2003. The sworn statement was not in the record before the NDRB, and the government claims that this statement is now missing. The NDRB failed to consider whether its loss of a document that the government itself has a legal duty to maintain rebuts any presumption of regularity that might otherwise attach.

94.     In fact, the NDRB clearly stated in a letter to Mr. Manker how this presumption of regularity operates in their favor: "Occasionally, files received from the archives are incomplete. If documents related to your case are missing and the NDRB review panel is unable to find evidence in the available records that your discharge was either improper or unfair, the NDRB will assume the government acted properly and fairly in releasing or discharging you from the service." By the NDRB's own admission, the Navy routinely applies the presumption even when the Navy itself has lost records that it is obliged to maintain.

95.     Mr. Manker was diagnosed with PTSD, TBI, and tinnitus by the VA in 2016, but the VA's determination arrived after Mr. Manker submitted his brief to the NDRB. Therefore he was unable to include the VA's diagnosis alongside the two diagnoses from private providers cited in his application.

**Allegations as to NVCLR**

96.     NVCLR is a § 501(c)(3) non-profit incorporated and based in Connecticut, with offices in New Haven.  Its purpose is to assist veterans with less-than-Honorable discharge statuses and to educate the public about the stigma and struggles these veterans face. National Veterans Council for Legal Redress, *available at* http://nationalveteranscouncil.com/.

97.     NVCLR membership is open to all former service members regardless of discharge status. At present most of its members, including John Doe, reside in Connecticut.

98.     Numerous NVCLR members have received an OTH discharge characterization upon their separation from the miliary, including members other than John Doe who were discharged by the Navy or Marine Corps. These members either have or will be affected by the NDRB's adjudications of their discharge upgrade applications.

99.     NVCLR holds regular meetings of veterans and their family members in the New Haven area.  It has aided veterans in seeking VA benefits and applying for discharge upgrades. .

100.     NVCLR members, including John Doe and Tyson Manker, have received Other-than-Honorable discharges based on conduct attributable to undiagnosed PTSD from service and have applied to the NDRB for a discharge upgrade based on PTSD attributable to service but have been denied.

101.     NVCLR brings this action on its own behalf and also on behalf of its members. NVCLR's membership includes at least one member of the proposed class who would have individual standing to pursue the claims set forth below.  Because of the nature of the claims alleged in this complaint and the nature of the relief sought, the individual participation of each affected member under NVCLR is not indispensable to the proper resolution of this lawsuit.

**Allegations as to NVCLR member John Doe**

102.     John Doe, a Connecticut native and current resident, enlisted in the Marine Corps in December 2000 at the age of nineteen, right out of high school.

103.     Many members of Mr. Doe's family, including his grandfather, were veterans. Mr. Doe dreamed of joining the military so that he could follow in his grandfather's footsteps and serve his country.

104.     Mr. Doe completed basic training at Marine Corps Recruit Depot Parris Island, South Carolina, and Marine Combat Training at the U.S. Marine Corps School of Infantry at Camp Geiger, North Carolina. After training, he was stationed at Marine Corps Base Camp Lejeune, North Carolina, and worked in logistics.

105.     Mr. Doe struggled at first. He committed minor infractions on several occasions. His commanders did not consider these infractions significant enough to merit discharge, nor to preclude service in combat. Mr. Doe deployed with his unit to Kuwait in 2003.

106.     Mr. Doe's unit was one of the first to cross into Iraq from Kuwait on March 20, 2003, as part of Operation Iraqi Freedom. Mr. Doe was part of a team that provided security for a combat unit within the 2nd Marine Division.

107.     Consistent with typical symptoms of PTSD, Mr. Doe's memory of his service is a blur, but there are some memories he cannot forget.

108.     Mr. Doe's unit met its first major resistance in Nasiriyah, during the initial invasion. One of the unit's assault amphibious vehicles was hit with a rocket-propelled grenade, leading to the death of a Corporal. The Corporal was a fellow young Marine from Connecticut and one of the first U.S. casualties of the Iraq War.

109.     During the fighting in Nasiriyah, Mr. Doe was in a vehicle that drove over the body of an Iraqi. The vehicle operator drove over the corpse a second time to make sure the man was dead, and Mr. Doe vividly recalls the man's viscera looking like Pepto-Bismol on the road.

110.     Throughout the push to Baghdad, Mr. Doe's unit continued to be embroiled in fighting. His unit remained in active combat in Baghdad for several weeks.

111.     Mr. Doe's unit then departed Baghdad for Diwaniyah, where he, along with several other Marines, contracted dysentery.

112.    While in Iraq, Mr. Doe witnessed repeated explosions, firefights, and intense urban combat. He saw dead bodies, dogs eating rotten corpses, and women, children, and men being killed.

113.    In the face of intense trauma, Mr. Doe served his country with valor. For his service in Iraq, Mr. Doe earned the Combat Action Ribbon. His unit received the rarely-awarded Presidential Unit Citation.

114.    Over the course of his deployment, Mr. Doe's Conduct marking was a 4.2 out of 5, which the Marine Corps characterizes as: "No offenses. No unfavorable impressions as to attitude, interests, cooperation, obedience, after-effects of intemperance, courtesy and consideration, and observance of regulations." Marine Corps Individual Records Administration Manual § 4005.

115.    The Staff Sergeant who testified during Mr. Doe's discharge proceedings said of Mr. Doe that he was a good Marine who served in combat without any incident.

116.    Mr. Doe did not receive any citations or infractions for misconduct while deployed.

117.    After completing his tour of duty, Mr. Doe returned to the U.S. suffering from the deep but invisible wounds of war. He began to experience symptoms of PTSD, such as nightmares, memory loss, and anxiety. He would wake up in the middle of the night drenched in sweat and screaming from bad dreams. His nights became so terrible that he stopped being able to fall asleep at all.

118.    Mr. Doe developed PTSD as a result of the traumatic events that he experienced while in combat during his service in the Marine Corps.

119.     As so many Marines with PTSD do, Mr. Doe did not seek mental health counseling or other mental health-related treatment while in the Marine Corps. Instead, he began to self-medicate to cope with his trauma and sleeplessness.

120.     Many nights after work, he would buy an 18-pack of beer and drink until he passed out. Then he would wake up and drink to the point of memory loss until he passed out again. He felt that he could not elude his nightmares or fall asleep otherwise.

121.     During this period of heavy drinking, a Non-Commissioned Officer found a nipple ring among Mr. Doe's personal effects during an inspection in August 2003. Mr. Doe was charged for violating Article 92 of the Uniform Code of Military Justice (UCMJ) for failure to obey a lawful order regarding Marine Corps uniform regulations, which prohibit most body piercings.

122.     Due to his PTSD-related alcohol use, Mr. Doe woke up many days still drunk or hungover. Later in August 2003, he felt sick during gym time and returned to his barracks early. As a result, he was given an Unauthorized Absence citation under Art. 86 of the UCMJ.

123.     On January 14, 2004, the Marine Corps discharged Mr. Doe with an Other-than-Honorable discharge due to a pattern of misconduct.

124.     After his discharge, Mr. Doe continued to struggle with severe PTSD. He drank between twelve and twenty-four beers a day. He could fall asleep only during the day with the lights on, and when he did, he often woke up screaming.

125.     In July 2004, less than a year after his discharge from the Marine Corps, Mr. Doe called his father and expressed suicidal ideations. His father called the police, who brought Mr. Doe to the emergency room at the local hospital.

126.    At the hospital, doctors diagnosed Mr. Doe with PTSD. According to the hospital's treatment notes, Mr. Doe was experiencing daily suicidal ideation.

127.    On August 6, 2008, Mr. Doe applied *pro se* to the NDRB for a discharge upgrade, requesting a documentary records review. The NDRB denied his application on September 24, 2009.

128.    Mr. Doe also applied for VA benefits, but the VA denied his application due to his discharge characterization.

129.    Devastated by the denials, Mr. Doe attempted suicide.

130.    Before the attempt, he shaved his head, put on his dress blues, and told his wife that he loved her. He locked the basement door and screwed it shut to prevent his wife and others from intervening. Unable to stop him, his wife called the police, who broke into the basement and found Mr. Doe hanging from his belt.

131.    Emergency personnel took Mr. Doe to a different local hospital, and placed him in a medically-induced coma. He was kept alive with multiple life-support measures, but exhibited decreased brain function with significantly impaired neurological response. After a few days, his vitals stabilized and he began a long recovery process with the help of his wife.

132.    In the years after his discharge, Mr. Doe secured short-term employment working at a restaurant, installing fireplaces, and hanging garage doors.

133.    Mr. Doe has had to leave each of these jobs because of his functional impairment, disrupted sleep cycle, hypervigilance, struggles with interpersonal conflict, and other symptoms of his PTSD.

134.    Still, Mr. Doe has attempted to turn his life around. He and his wife have been together for over a decade and are raising two young children.

135.    Mr. Doe has been sober since October 2010. He attributes his sobriety to his desire to become a better father and role model for his children.

136.    Mr. Doe has received free, twice-weekly treatment for his PTSD, including individual and group counseling, at his local Veterans Center. These sessions included a thirteen-week "parenting with PTSD" program, in which Mr. Doe worked with counselors on meeting the demands of raising his two children while living with PTSD .

137.    Treatment has helped. Mr. Doe feels that, sometimes, speaking to his therapist is the only thing that can calm him down.

138.    In early 2014, Mr. Doe again applied *de novo* for a discharge upgrade with *pro bono* counsel and sought a personal appearance hearing.

139.    A major change in NDRB policy came in September 2014, when then-Secretary of Defense Hagel issued guidance to the Boards that was "intended to ease the application process for veterans" with PTSD seeking discharge upgrades. Ex. 1, Hagel Memo, at 1.

140.    Despite this memo and other implementing guidance, the NDRB denied Mr. Doe's second application on December 16, 2014. Ex. 4, NDRB Decision Dated Dec. 16, 2014 ("Second Doe NDRB Decision"). The NDRB did so without mention or application of the Hagel Memo.

141.    In 2015, Mr. Doe retained the Yale Veterans Legal Services Clinic ("the Clinic") to assist him in appealing his 2014 NDRB denial in federal court.

142.    The Clinic arranged for Mr. Doe to receive a detailed psychiatric assessment by physicians at the Yale School of Medicine. This forensic evaluation confirmed Mr. Doe's prior diagnosis of combat-related PTSD and concluded that his condition should be considered a mitigating factor for his misconduct during his service.

143.    Before filing suit, Mr. Doe shared his proposed complaint with the U.S. Attorney's Office. Eight days later, the Navy, acting through its counsel, offered to have the NDRB reconsider the matter. Mr. Doe agreed.

144.    Mr. Doe submitted a new discharge application arguing that, under the Hagel Memo, he deserved a discharge upgrade as a matter of equity because the underlying cause of his misconduct was service-connected, combat-related PTSD, or a PTSD-related condition, and because his misconduct was not premeditated or severe.

145.    Mr. Doe also argued that under current procedures, he would have been screened for PTSD and received treatment or a medical discharge.

146.    On January 30, 2017, the NDRB denied Mr. Doe's application for a third time. Ex. 5, NDRB Decision Dated Jan. 30, 2017 ("Third Doe NDRB Decision").

147.    In its decision, the NDRB credited Mr. Doe's PTSD diagnosis, and it also appeared to believe that his PTSD arose during his military service. But the Board nonetheless concluded that Mr. Doe's mental health condition did not excuse or mitigate his misconduct.

148.    The NDRB first addressed the Article 92 violations related to Mr. Doe's nipple piercing. The NDRB concluded that this misconduct could not possibly be mitigated by Mr. Doe's combat-related PTSD since "the record reveals that the Applicant obtained his piercing before he deployed." *Id.* at 5.

149.    The NDRB failed to explain how, if Mr. Doe had a piercing "before he deployed," that piercing was not detected in the physical examinations conducted by the Marine Corps at enlistment and thereafter.

150.     The NDRB's discussion also did not address Mr. Doe's testimony that, during a drinking binge *after his return from Iraq* and while he was suffering from PTSD, he had his nipple pierced.

151.     The NDRB went on to conclude that Mr. Doe's Article 86 violation—in connection with the August 2003 incident in which Mr. Doe left a required physical training session at a gym without being excused—could not have been mitigated by PTSD since his misconduct was "either pre-existing to PTSD, or premeditated." *Id.* at 5.

152.     However, the NDRB gave no affirmative reason for concluding that Mr. Doe's leaving the training session was "pre-existing to PTSD, or premeditated." The NDRB did not acknowledge that Mr. Doe's decision to leave the gym without authorization may have been an indication of impulsivity, a common symptom of PTSD. Nor did the NDRB address Mr. Doe's factual allegation that he left the gym early because he was feeling ill.

153.     The Board also failed to explain how its conclusions comported with the "liberal consideration" with which it was required to consider Mr. Doe's claims.

154.     The NDRB did not address Mr. Doe's argument that, under current rules and procedures, he would not have been separated without a thorough evaluation for PTSD. If diagnosed, he either would have been treated and retained or would have received a separation due to disability rather than for misconduct.

155.     In all likelihood, Mr. Doe would have been diagnosed with PTSD before separation and he would have received a medical discharge.

**Allegations as to the Class Generally**

156.    Since 2001, more than 2.7 million U.S. military personnel—including approximately one million Sailors and Marines—have served on active duty in Iraq and Afghanistan. Over half have deployed more than once.

157.    In that time, approximately fifteen percent of all service members have left the military with less-than-Honorable discharges. By contrast, only seven percent of Vietnam-Era veterans and less than two percent of World War II-Era veterans received less-than-Honorable discharges.

158.    These hundreds of thousands of veterans with less-than-Honorable discharges are generally ineligible for numerous benefits that their service has otherwise earned them. This includes compensation for service-connected disabilities, special unemployment compensation programs for veterans, a military burial, and benefits for surviving family members. Veterans with a less-than-Honorable discharge are categorically denied GI Bill education benefits and civil service retirement credits, and they are generally denied veterans' benefits provided by state and local governments.

159.    Without these benefits, veterans are unable to access the health care they need, are forced to pay out of pocket for educational and vocational training opportunities, and are left largely without the support that is vital to ensuring a successful transition back into civilian life.

160.    Furthermore, many employers reject applications from veterans with less-than-Honorable discharges, even when those discharges are associated with only minor misconduct. Employers regularly learn of an applicant's discharge status through a routine background check or by requesting that the veteran submit their discharge certificate (called a "DD-214," denoting

the acronym on the form provided by the U.S. Department of Defense upon a military servicemember's discharge from the military) with their application.

161.    A less-than-Honorable discharge carries a stigma that casts doubt on a veteran's personal character and ability to perform as an employee.

162.    A derogatory narrative reason for separation, which appears with the discharge status on a veteran's DD-214, can impose a similar or additional stigma on discharged veterans. For example, many less-than-Honorably discharged veterans receive a narrative reason for separation of "personality disorder" or "misconduct" without any additional explanation.

163.    Many veterans with less-than-Honorable discharges were discharged due to misconduct attributable to undiagnosed PTSD, TBI, or other related mental health conditions that they developed as a result of their military service or as a result of an experience of military sexual trauma (MST).

164.    PTSD is a psychiatric disorder that can result from experiencing, witnessing, or confronting a traumatic event. Events that lead to PTSD are frequently life-threatening. PTSD is the most prevalent mental disorder arising from combat experience, and it is also frequently developed after sexual assault. Its symptoms include flashbacks or nightmares relating to the traumatic event, avoidance of anything associated with the trauma, and hypervigilance, which often manifests in difficulty concentrating and irritability.

165.    According to the VA, 11 percent of Afghanistan veterans and 20 percent of Iraq veterans suffer from PTSD. Similarly, 10 percent of Gulf War veterans and 31 percent of Vietnam veterans have PTSD.

166.     Researchers estimate that approximately 16 percent of servicemembers experience MST during their service. Victims are four times more likely to suffer from PTSD compared to veterans with no sexual-assault histories.

167.     Researchers have found that, among U.S. Marines deployed to Iraq and Afghanistan, Marines with a diagnosis of PTSD were *eleven times* more likely to have a misconduct discharge compared to their peers who did not have a psychiatric diagnosis.

168.     The Government Accountability Office estimates that from 2011 to 2015, more than 57,000 servicemembers were separated from the military for misconduct despite a diagnosis of PTSD, TBI, or another mental health condition that could be associated with misconduct. This amounts to 62 percent of all servicemembers separated for misconduct during the same period. Government Accountability Office,  *DOD Health: Actions Needed to Ensure Post-Traumatic Stress Disorder and Traumatic Brain Injury Are Considered in Misconduct Separations*, GAO-17-260 (May 2017) ("GAO Report"), *available at* https://www.gao.gov/assets/690/684608.pdf.

169.     The military frequently fails to comply with its own screening, training, and counseling policies related to PTSD and TBI. Out of 48 Marine Corps separation packets reviewed by the GAO, eighteen lacked documentation showing that the servicemember had been screened for PTSD and TBI. GAO Report, at 24. The Navy lacks a PTSD screening policy consistent with Department of Defense requirements. *Id.* at 16.

170.     Mental health issues and diagnoses carry pervasive societal stigma that often deters individuals from seeking the help they need. This stigma is no less acute within the military.

171.     The Navy and the Marine Corps have long shared a culture of downplaying the severity and pervasiveness of PTSD while stigmatizing those who seek treatment.

172.    For example, in a 2014 speech to the Marines' Memorial Club, retired Marine Corps General James Mattis, now Secretary of Defense, stated his opinion that "[f]or those who have been through [combat] and the shock absorber wasn't sufficient, there's not too much we can do."

173.    He further stated that "there is one misperception of our veterans and that is they are somehow damaged goods. I don't buy it . . . [w]hile victimhood in America is exalted, I don't think our veterans should join those ranks." General Mattis concluded that "[t]here is also something called posttraumatic growth, where you come out of a situation like that and you actually feel kinder toward your fellow man and fellow woman."

174.    However, compared to PTSD, which is widely studied and officially recognized in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM), the concept of "posttraumatic growth" is controversial.

175.    A 2015 peer-reviewed study of more than 450 soldiers deployed to Iraq found that "[those] who reported more posttraumatic growth had more posttraumatic stress later on . . . . The findings are inconsistent with the general idea that perceived growth has positive implications for mental health after stressful events." Iris M. Engelhard et al., *Changing for Better or Worse? Posttraumatic Growth Reported by Soldiers Deployed to Iraq*, 3 Clinical Psychol. Sci. 789, 794 (2015), http://journals.sagepub.com/doi/pdf/10.1177/2167702614549800.

176.    Veterans with less-than-Honorable discharges as a result of PTSD-related misconduct are saddled with both the symptoms of their PTSD or related conditions and the stigma of their discharge. As a result, nearly all of these veterans are unable to obtain the disability, educational, and other kinds of benefits to which their service otherwise entitles them.

177.    The NDRB, like the Army and Air Force Discharge Review Boards, was established in the aftermath of World War II and is charged with correcting improper or inequitable discharges.

178.    In establishing the Discharge Review Boards, Congress expressed an intent to avoid over-harsh consequences for servicemembers discharged as the result of mental health conditions. *See, e.g., An Act to Provide Federal Government Aid for the Readjustment in Civilian Life of Returning World War II Veterans: Hearing on H.R. 3917 and S. 1767 Before the House Comm. on World War Veterans' Legislation*, 78th Cong 182 (1944) at 192; 78 Cong. Rec. 4453 (1944).

179.    But contrary to the equitable purpose for which the NDRB was established, in recent years the Navy has issued near-blanket denials to Sailors and Marines seeking discharge upgrades in connection with PTSD, TBI, and other mental health conditions.

180.    According to records released by the Department of Defense in settlement of a Freedom of Information Act lawsuit, since January 2016, the NDRB has granted discharge upgrades in just 15 percent of cases in which PTSD was alleged to have been a contributing factor.

181.    By contrast, in the same period and subject to the same legal regime, the Army Discharge Review Board (ADRB) has granted discharge upgrades in 45 percent of such cases, and the Air Force Discharge Review Board (AFDRB) has granted discharge upgrades in 37 percent of such cases.

182.    Since issuance of these binding instructions in 2014, the NDRB has recognized that the Hagel Memo applies to its adjudications. *See also* 10 U.S.C. § 1553(d)(3)(A)(ii) (as

amended by Pub. L. 114-328, Div. A, Title V, § 535, Dec. 23, 2016, 130 Stat. 2123-24)

(codifying Hagel Memo "liberal consideration" standard in DRB statute).

183.    However, in a sample of 299 NDRB decisions issued since 2015, randomly

selected from all decisions issued by the NDRB in that period and published in the NDRB's

online reading room, the NDRB cited the Hagel Memo in only 66 percent of cases involving

allegations or indications of PTSD or TBI and in only 44 percent of cases involving allegations

or indications of PTSD, TBI, or other related mental health conditions.

184.    In the cases sampled, where the NDRB fails to cite the Hagel Memo despite

allegations or indications of PTSD or PTSD-related conditions, the NDRB also does not cite past

decisions to explain why it is citing the Hagel Memo in some but not other PTSD-related cases.

185.    On information and belief, the NDRB frequently denies veterans' discharge

upgrade applications on the basis of the presumption of governmental regularity without

explaining why this presumption applies and why the contrary evidence provided is insufficient

to rebut it, particularly in view of the federal statute that codifies the "liberal consideration"

standard set forth in the Hagel Memo.

186.    The Defendant routinely loses documents of which it is legally required to

maintain possession. Even when Defendant loses records that it has a duty to maintain, the

NDRB routinely draws an inference in favor of the government, in derogation of spoliation of

evidence principles.

187.    In order to assist veterans in preparing their own discharge upgrade applications,

the NDRB is required to promptly publish all discharge upgrade decisions to a publicly-available

online reading room.

188.    Despite its legal obligation to promptly make public all decisional documents relating to discharge upgrade applications, the NDRB routinely delays such publication or altogether fails to publish past decisions.

189.    Without the benefit of clear and available prior decisions, the NDRB deprives applicants of the opportunity to cite to cases that may be similar to their own case. Furthermore, even veterans with meritorious cases are often unaware of how to satisfy the NDRB's unclear decisional standards due to the dearth of clear and available precedent.

### The Proposed Class Definition

190.    This is a class action seeking equitable relief under Rule 23(b)(2) of the Federal Rules of Civil Procedure for violations of the Administrative Procedure Act and the Fifth Amendment.

191.    The proposed class includes all Navy and Marine Corps veterans who: (a) were discharged with less-than-Honorable discharges (this includes General and Other-than-Honorable discharges) within the past fifteen years; (b) have not received discharge upgrades to Honorable; and (c) have a diagnosis of PTSD or PTSD-related conditions, or records documenting one or more symptoms of PTSD or PTSD-related conditions at the time of discharge, attributable to their military service under the Hagel Memo standards of liberal or special consideration.

### The Proposed Class Satisfies the Requirements of Rule 23

192.    The members of the proposed class are so numerous that joinder of all members is impracticable. Based on the Navy's disclosures in settlement of FOIA litigation, the NDRB has adjudicated 279 claims in 2016 and 2017 and has denied more than 85 percent of them.

193.    Over 100,000 Sailors and Marines have received less-than-Honorable discharges since 2002. Thousands of these former service members suffered combat-related PTSD or PTSD-related conditions, TBI, or MST but recived a less-than-Honorable discharge for misconduct attributable to these conditions.

194.    Nearly all who applied for a discharge upgrade to the NDRB were denied.

195.    The members' injuries derive from a unitary course of conduct by the centralized, hierarchical systems supervised and controlled by Defendant.

196.    Many members of the proposed class suffer serious psychological and physical consequences as a result of the long-term stigma associated with their less-than-Honorable discharges and the benefits they are denied as a result of their discharge status. There are questions of law and fact common to the proposed class, including, but not limited to, whether:

    a.    Defendant, acting through the NDRB, has failed to apply consistent standards in the discharge upgrade review process, resulting in arbitrary and capricious adjudications in violation of the Administrative Procedure Act;

    b.    Defendant, acting through the NDRB, has failed to comply with the September 2014 Hagel Memo and its subsequent implementing guidance and statutory codification; and

    c.    Defendant, acting through the NDRB, has deprived Plaintiffs and putative class members of protected liberty and property interests without due process of law, resulting in an unconstitutional administrative process in violation of the Administrative Procedure Act.

197.    The claims of the individual Plaintiffs are typical of the claims of the proposed class members.

198.    Plaintiffs and their counsel will fairly and adequately protect the interests of the proposed class.

199.    Defendant, in failing to properly implement the NDRB's statutory mandate and by using unclear and unlawful standards for discharge upgrades, has acted or refused to act on grounds that apply generally to the class, and therefore final injunctive relief and/or corresponding declaratory relief is appropriate respecting the class as a whole.

## LEGAL CLAIMS OF THE CLASS

### CLAIM I

### Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)— Arbitrary and Capricious Agency Action

200.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

201.    Defendant's denials of class members' discharge upgrade applications are final agency actions.

202.    The NDRB grants only about 15 percent of the PTSD-related applications before it, whereas the Army Discharge Review Board—which operates under the same statute, regulations, and guidance as the NDRB, including the Hagel Memo—grants approximately 45 percent of applications involving allegations of PTSD.

203.    The enormous discrepancy in grant rates between the NDRB and the ADRB results in part from the NDRB's systematic failure to give "special consideration" to veterans' VA diagnoses of PTSD or "liberal consideration" to diagnoses by private practitioners, as directed by the Hagel Memo.

204.    In failing to meaningfully apply the Hagel Memo to the class members' discharge upgrade applications, Defendant has acted arbitrarily and capriciously, in abuse of his discretion, and contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

205.    The NDRB only cites the Hagel Memo in approximately two-thirds of cases involving PTSD or TBI, but does not explain why it fails to cite the Memo in the other cases.

206.    By failing to give reasons for applying relevant legal standards in some cases, but not others, the NDRB issues decisions that are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

207.    Defendant, acting through the NDRB, has further abused his discretion by failing to explain the evidentiary standards under which discharge upgrade applications are adjudicated. This has made it impossible for veterans to know what evidence the NDRB would credit, and therefore impossible for these veterans to prepare their applications effectively. Defendant's failure, moreover, has made it impossible for veterans to detect the NDRB's abuses of discretion when weighing evidence.

208.    Defendant's failure to publish evidentiary standards for discharge upgrade applications constitutes arbitrary agency action, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

209.    Given the systematic problems with the Navy and Marine Corps' treatment and discharge of veterans with PTSD, TBI, and MST-related misconduct, the NDRB's application of the presumption of regularity in government affairs is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). This is particularly true when the NDRB applies the presumption to all cases of missing records and fails to explain why the presumption

is not rebutted in the face of contrary evidence, as is required by the Department of Defense's own regulations. DODI 1332.28 § E3.5.3.2.2.2.

## CLAIM II

### Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)—
### Agency Action Contrary to Constitutional Right

210.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

211.    The due process protections of the Fifth Amendment require that federal administrative agencies follow their own regulations and sub-regulatory guidance in conducting their adjudications and that they conduct adjudications in a fair and orderly manner.

212.    By not meaningfully applying the Hagel Memo to class members' applications, Defendant has failed to follow its own rules, in violation of its constitutional obligations and the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

213.    The NDRB only cites the Hagel Memo in approximately two-thirds of cases involving PTSD or TBI, but does not explain why it fails to cite the Memo in the other cases. This means the burden of production of evidence to require the Hagel Memo's application in a particular case is unknown to veterans before they apply. Veterans therefore lack the notice required by due process standards, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

214.    Given the systemic problems with the Navy and Marine Corps' treatment and discharge of veterans with PTSD and TBI, the NDRB's application of the presumption of regularity in government affairs is likely to result in a high risk of erroneous decisions, in violation of due process guarantees. This is particularly true when the NDRB applies the

36

presumption in all cases of missing records and fails to explain why the presumption is not rebutted in the face of contrary evidence.

215.    The failure of the NDRB to explain how the presumption of regularity operates, when it is rebutted, and why it is justified results in veterans lacking adequate notice of the standards that will be used to adjudicate their applications. This violates constitutional rights to procedural due process, which is a violation of the Administrative Procedure Act's guarantee of constitutional agency actions.

216.    By not publishing evidentiary standards, Defendant has further violated its constitutional obligations in violation of the Administrative Procedure Act. Defendant's secrecy on this point has made it impossible for veterans to prepare effective applications or to understand how the NDRB arrived at a given outcome, contrary to principles of fair adjudication.

217.    Defendant's failure to publish evidentiary standards has also rendered the decisionmaking process a black box where abuses of discretion in weighing evidence are undetectable.

218.    Finally, Defendant's high rate of denying PTSD-related discharge upgrade applications—about 85 percent—indicates that the NDRB has a systemic institutional bias or secret policy that discriminates against applicants who suffer from PTSD.

219.    This secret policy is unfair and contrary to the Plaintiffs' constitutional right to due process because it contradicts public guidance, such as the Hagel Memo, and because it underlies a sham decisionmaking process whereby denial is virtually preordained for applicants before the NDRB due to prejudice.

220.    Veterans improperly denied discharge upgrades are subjected to undue stigma as a result of both their discharge characterizations and their narrative reasons for separation. They

are also denied access to VA benefits and other services that they have rightfully earned through their service. Veterans are being deprived of both a liberty and property interest in these unlawful adjudications.

221.    The NDRB's secret policy that discriminates against applicants who suffer from PTSD is contrary to Plaintiffs' constitutional rights and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

### CLAIM III

**Violations of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C)—**
**Agency Action in Excess of Statutory Authority or Short of Statutory Right**

222.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

223.    In establishing the NDRB, Congress recognized that an Other-than-Honorable discharge issued to maintain military discipline should not be a life sentence when a veteran has not acted out of moral turpitude, especially when the veteran's underlying misconduct may be attributable to the stressors of combat and mental health conditions. 10 U.S.C. § 1553.

224.    Congressional intent in establishing review boards such as the NDRB was to protect veterans with Other-than-Honorable discharges from being unjustly burdened with such life sentences.

225.    The NDRB and ADRB are both governed by the same Department of Defense statute, regulations, and guidance defining the standards for discharge upgrades. Yet, the ADRB grants discharge upgrades at nearly four times the rate that the NDRB does.

226.    The Navy's comparatively low grant rate shows that Sailors and Marines are being denied their statutorily-mandated access to the discharge upgrade procedures set forth by Congress and implemented by the Department of Defense.

227.    In its virtually categorical denial of PTSD-related discharge upgrade applications, Defendant has failed to carry out Congress' intent in establishing the Discharge Review Boards and setting forth their governing standards, thereby exceeding its authority, and has fallen short of vindicating the statutory right Congress created for veterans, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

## LEGAL CLAIMS OF TYSON MANKER

### CLAIM IV

### Violations of the Administrative Procedure Act

228.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

229.    Defendant's denial, through the NDRB, of Mr. Manker's discharge upgrade application is a final agency action.

230.    Defendant failed to give "liberal consideration" to his PTSD and TBI diagnosis by a private practitioner as directed by the Hagel Memo. Defendant thus failed to meaningfully apply the Hagel Memo to Mr. Manker's application.

231.    Defendant failed to consider important evidence that demonstrated that Mr. Manker's PTSD and TBI mitigated the misconduct that led to his discharge.

232.    Defendant failed to follow its own rules by not responding to all the facts and issues raised in Mr. Manker's application.

233.    Defendant applied the presumption of regularity in government affairs to Mr. Manker's case without explaining why it was justified given the missing records. Moreover, Defendant failed to provide him with adequate notice of how to rebut such a presumption. The NDRB also failed  to explain why the presumption was not rebutted and why principles of spoliation of evidence did not apply in Mr. Manker's case.

234.    Defendant's failure to meaningfully apply the Hagel Memo to Mr. Manker's application, and its failure to consider and respond to all the facts and issues raised therein, were arbitrary and capricious, an abuse of Defendant's discretion, contrary to the due process protections of the Fifth Amendment, and in excess of Defendant's statutory authority, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

## LEGAL CLAIMS OF NVCLR ON BEHALF OF JOHN DOE

### CLAIM V

### Violations of the Administrative Procedure Act

235.    The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

236.    Defendant's denials of the discharge upgrade applications of NVCLR member John Doe are final agency actions.

237.    Defendant failed to give "special consideration" to Mr. Doe's diagnosis of PTSD by the VA or to give "liberal consideration" to his diagnoses by private practitioners as directed by the Hagel Memo. Defendant thus failed to meaningfully apply the Hagel Memo to Mr. Doe's applications.

238.    Defendant failed to consider important evidence that demonstrated that Mr. Doe's PTSD or PTSD-related condition mitigated the misconduct that led to his discharge.

239.    Defendant failed to follow its own rules by not responding to all the facts and issues raised in Mr. Doe's applications.

240.    Defendant applied the presumption of regularity in government affairs to Mr. Doe's case without explaining why it was justified given the missing records. Moreover, Defendant failed to provide him with adequate notice of how to rebut such a presumption. The

NDRB also failed  to explain why the presumption was not rebutted and why principles of spoliation of evidence did not apply in Mr. Doe's case.

241.    Defendant's failure to meaningfully apply the Hagel Memo to Mr. Doe's applications, and its failure to consider and respond to all the facts and issues raised therein, was arbitrary and capricious, an abuse of Defendant's discretion, contrary to the due process protections of the Fifth Amendment, and in excess of Defendant's statutory authority, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(1)    Grant all appropriate and equitable relief to redress past injury and to restrain future injury of Plaintiffs and members of the proposed class by Defendant;

(2)    Direct, by issuance of an injunction, measures sufficient to ensure that Defendant establishes constitutionally and statutorily compliant adjudication procedures, including, but not limited to, publication of secret policies, improved training of agency personnel, and clarified evidentiary standards;

(3)    Direct, by issuance of an injunction, measures sufficient to ensure that Defendant meaningfully and consistently applies its own procedural standards in considering the effects of class members' PTSD when determining whether to upgrade their discharge statuses;

(4)    Direct, by issuance of an injunction, that the discharge statuses of Tyson Manker and John Doe be upgraded to Honorable;

(5)    Award attorneys' fees and costs to Plaintiffs; and

(6)    Grant any other and further relief that the Court deems just and proper.

Dated: March 2, 2018
New Haven, Connecticut

Respectfully submitted,


By: /s/ Michael J. Wishnie
Samantha G. Peltz, Law Student Intern*
Jonathan B. Petkun, Law Student Intern*
Westley A. Resendes, Law Student Intern*
Helen E. White, Law Student Intern*
Aaron Wenzloff, Supervising Attorney, ct28616
Michael J. Wishnie, Supervising Attorney, ct27221
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

Susan J. Kohlmann**
Jeremy M. Creelan**
Jeremy H. Ershow**
Jessica A. Martinez**
Matthew J. Wilkins**
Jenner & Block LLP
919 Third Avenue, New York, NY 10022-3908
Tel: (212) 891-1678
jcreelan@jenner.com

* Motion for Law Student Appearances
forthcoming.
** Motion for *Pro Hac Vice* Appearances
forthcoming.