## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

TYSON MANKER, on behalf of himself and
all others similarly situated, and NATIONAL
VETERANS COUNCIL FOR LEGAL
REDRESS, on behalf of itself, its members,
and all others similarly situated,

                    Plaintiffs,

   v.

RICHARD V. SPENCER, Secretary of the
Navy,

                  Defendant.

Civil Action No.
3:18-cv-372 (CSH)

**NOVEMBER 7, 2019**

## RULINGS ON DEFENDANT'S MOTION TO DISMISS OR REMAND
## AND ON CROSS-MOTIONS FOR DISCOVERY

**HAIGHT, Senior District Judge:**

      This is a class action on behalf of United States Navy (the "Navy") and United States Marine

Corps (the "Marine Corps" or "Marines") veterans who were allegedly denied discharge upgrades

by the Naval Discharge Review Board ("NDRB") in a manner violative of the Administrative

Procedure Act ("APA") and the Fifth Amendment. This Ruling resolves several pending motions.

## I.   INTRODUCTION

      Class certification was sought by two named Plaintiffs: Tyson Manker and the National

Veterans Council for Legal Redress ("NVCLR"). Manker is a Marine Corps veteran who was

deployed in Iraq during 2003 in support of the military action denominated "Operation Iraqi

Freedom." Doc. 1 (Complaint), at 2. The record also refers to an individual called "John Doe," a

Marine Corps veteran and member of NVCLR who was also deployed in Iraq during 2003. *Id.* For

reasons that will become apparent, the events relating to John Doe are relevant to the issues in the case, though the NVCLR—not its member Doe—is a named party Plaintiff, together with Manker.

Manker and Doe were both discharged from the Marines with less-than-Honorable discharges, and have subsequently attempted without success to obtain from the Navy upgrades to Honorable discharges. Doc. 1, at 3.

The class sought to be certified by the named Plaintiffs consisted of Navy, Navy Reserve, Marine Corps, and Marine Corps Reserve veterans of the Iraq and Afghanistan era who (a) were discharged from service with less-than-Honorable discharges; (b) have not received discharge upgrades to Honorable; and (c) have diagnoses of Post Traumatic Stress Disorder ("PTSD"), traumatic brain injury ("TBI"), PTSD-related conditions, or records documenting one or more symptoms of PTSD, TBI, or PTSD-related conditions at the time of discharge, those conditions or symptoms being attributable to their military service.

The Defendant is the Secretary of the Navy, the Executive Branch individual responsible for the NDRB. The gravamen of Plaintiffs' complaint is that the NDRB fails to follow the directive of a memorandum issued by then-Secretary of Defense Charles Hagel mandating that "liberal consideration" be given to diagnoses of PTSD and similar mental health conditions; and, to records indicating symptoms of those conditions. Doc. 1, at 3. Plaintiffs seek a class-wide injunction whose purpose is to correct the Navy's conduct in that regard. Doc. 1, at 41. The only relief sought by Plaintiffs is equitable in nature.

Plaintiffs moved for certification of the designated class pursuant to Federal Rule of Civil Procedure 23(b)(2), which allows a class action in a case where "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Doc. 12. The Court

certified the class in a previous opinion, familiarity with which is assumed. *See Manker v. Spencer*, 329 F.R.D. 110 (D. Conn. 2018). The class, as certified, includes veterans who served between October 7, 2001, and the present, were discharged from the Navy, Navy Reserves, Marine Corps, or Marine Corps Reserve with less-than-Honorable statuses, have not received upgrades of their discharge statuses to Honorable from the NDRB; and,

> have diagnoses of PTSD, TBI, or other related mental health conditions, or records documenting one or more symptoms of PTSD, TBI, or other related mental health conditions at the time of discharge, attributable to their military service under the Hagel Memo standards of liberal or special consideration.

*Id.* at 123.

The case is now before the Court on Defendant's motion to dismiss the Complaint, or in the alternative, to remand the case to the Navy for further administrative action. Doc. 67. The Plaintiff class opposes that motion in its entirety. Doc. 68. In addition, the parties have filed cross-motions to govern the nature, scope, and effect of pre-trial discovery. Docs. 61, 62. The questions concerning discovery, which are substantial and vigorously litigated, arise only if the Defendant's motion to dismiss fails.

This Ruling considers those motions in that order.

## II.     DEFENDANT'S MOTION TO DISMISS OR REMAND

Defendant moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction; and under Rule 12(b)(6) for failure to state a claim. Doc. 67-1, at 14–29. I consider those grounds for dismissal in Parts II.A and II.B. Defendant's alternative motion for a remand is considered in Part II.C.

## A.    Lack of Subject Matter Jurisdiction

### 1.    *Preliminary Discussion*

Rule 12 allows a defendant to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). The Supreme Court equates a district court's subject matter jurisdiction with the court's authority to adjudicate the case. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007) (noting that "a court need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction)" before dismissing the action for *forum non conveniens*). A federal district court's authority to adjudicate is not self-executing; it must be derived from the Constitution or a statute. "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247, 130 (2010) (citation and internal quotation marks omitted). "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const., Art. III, § 1). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). On occasion, such proof requires discovery beyond the pleadings. *See, e.g.*, *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007) ("[W]e have held that, in adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside the pleadings."). In deciding a motion to dismiss under Rule 12(b)(1), a district court may resolve disputed jurisdictional facts on the basis of evidence outside the pleadings. *See Zappia Middle E. Construction Company v. Emirate*

*of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

In the case at bar, Defendant's Brief in support of his Rule 12(b)(1) motion begins its discussion with the following assertion: "As a threshold matter, the Court lacks jurisdiction to review Plaintiffs' claims for five reasons." Doc. 67-1, at 3. The Brief lists those reasons as follows:

• Plaintiffs' challenges to their discharges and characterizations of service are not reviewable, and thus nonjusticiable, under the intramilitary immunity doctrine.

• To the extent Plaintiffs claim the NDRB failed to follow Department of Defense and Navy regulations, they must first exhaust their administrative remedies.

• Plaintiffs may seek judicial review under the APA only for an adverse decision by the Navy's civilian review board, which Plaintiffs have not sought.

• Plaintiffs' claims are moot, because a subsequent Department of Defense directive made the Hagel memo explicitly applicable to discharge review boards.

• Plaintiffs "lack standing to launch a broad programmatic attack against the NDRB under the APA."

*Id.* at 3–4.

A striking aspect of these bases for a lack of subject matter jurisdiction is that, explicitly or by implication, they all seem to relate exclusively to the individual circumstances of Tyson Manker and John Doe. Manker and Doe play important roles in this opera, but there are other soloists, a chorus, and a full orchestra—a fair analogy, given that the Court has certified a class of Navy and Marine Corps veterans whose claims satisfy the commonalty and typicality requirements of Rule 23.

The Complaint contains five claims. Claims I, II, and III are collected under the caption "Legal Claims of the Class." Doc. 1. Each claim is captioned "Violations of the Administrative

Procedure Act" and cites one or another of the several sub-sections found in section 10(e) of the Act, 5 U.S.C. § 706.

Specifically, class members allege in Claim I that "Defendant's denials of class members' discharge upgrade applications are final agency actions." Doc. 1 ¶ 201. The class members assert in Claim I that those denials constitute "arbitrary and capricious agency action," in violation of 5 U.S.C. § 706(2)(A). *Id.* ¶ 206. That section provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Class members allege in Claim II that constitutional Fifth Amendment due process protections "require that federal administrative agencies follow their own regulations and sub-regulatory guidance in conducting their adjudications and that they conduct adjudications in a fair and orderly manner." Doc. 1 ¶ 211. The class members claim that "[b]y not meaningfully applying the Hagel Memo to class members' applications, Defendant has failed to follow its own rules, in violation of its constitutional obligations and the [APA], 5 U.S.C. § 706(2)(B)." Doc. 1 ¶ 212. That section of the APA provides that a court shall hold unlawful agency action found to be "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

Class members allege in Claim III that Congress' intent "in establishing review boards such as the NDRB was to protect veterans with Other-than-Honorable discharges from being unjustly burdened" with life-time disadvantages attendant upon such discharges. Doc. 1 ¶ 224. The class members assert in Claim III that "Sailors and Marines are being denied their statutorily-mandated access to the discharge upgrade procedures set forth by Congress and implemented by the Department of Defense," with the result that "Defendant has failed to carry out Congress' intent in

establishing the Discharge Review Boards and setting forth their governing standards." *Id.* ¶¶ 226–27. According to the class members, Defendant has "thereby exceed[ed] its authority, and has fallen short of vindicating the statutory right Congress created for veterans, in violation of the [APA], 5 U.S.C. § 706(2)(c)." *Id.* ¶ 227. Section 706(2)(c) provides that a court shall hold unlawful agency action found to be "in excess of statutory jurisdiction, authority, or short of statutory right." 5 U.S.C. § 706(2)(c).

Claim IV is captioned as "Legal Claims of Tyson Manker." *Id.* ¶¶ 228–34. Claim V is captioned "Legal Claims of NVCLR on Behalf of John Doe." *Id.* ¶¶ 235–41. The substantive allegations are the same. Each claim is sub-captioned "Violations of the Administrative Procedure Act." Those violations are alleged to consist of Defendant's failure to apply the Hagel Memo to that individual's application for a discharge upgrade; failure to consider important evidence concerning the individual's mitigation of misconduct by PTSD and TBI affliction; Defendant's failure to follow its own rules requiring responding to all relevant facts and issues; and Defendant's wrongful application of the presumption of regularity in government affairs. *Id.* ¶¶ 228–41.

I have set forth these several claims pleaded in the Complaint at some length because in adjudicating the Defendant's jurisdictional challenge, the Court's consideration must include the case's class status and the circumstances of the class members. That is to say, in order for Defendant to succeed on his Rule 12(b)(1) motion to dismiss the Complaint in its entirety, he must demonstrate that as a matter of law this Court lacks subject matter jurisdiction over each and every claim plausibly pleaded in the Complaint on behalf of Manker, Doe, or any member of the certified Plaintiff class.

That group of veterans is of substantial size. While the number of class members cannot be

stated on the present record, the Complaint's allegations demonstrated that the numerosity requirement imposed by Rule 23 for class certification was met. According to the Complaint:

> Over 100,000 Sailors and Marines have received less-than-Honorable discharges since 2002. Thousands of these former service members suffered combat-related PTSD or PTSD-related conditions, TBI, or MST but received a less-than-Honorable discharge for misconduct attributable to these conditions. Nearly all who applied for a discharge upgrade to the NDRB were denied.

Doc. 1 ¶¶ 193–94.

Given these allegations, which are not contradicted by anything in the present record, it is likely that the class is comprised of at least hundreds, more likely several thousand, Navy and Marine Corps veterans, arrayed within the ranks of the class certified by the Court. That certification adopts the Complaint's allegations and, as noted *supra*, creates a class of Navy and Marine Corps veterans who served from 2001 to the present, received less-than-Honorable discharges, were denied upgrades by the NDRB, and had diagnoses of PTSD, TBI, or other related mental health conditions attributable to their military service. *See Manker*, 329 F.R.D. at 123.

If the Complaint survives Defendant's motion to dismiss and discovery takes place, the number of class members may appear with more precision, and the circumstances of additional individual veterans may be elucidated. But that possibility does not affect the present motion to dismiss the entire Complaint for lack of subject matter jurisdiction. To dismiss the action on that ground, the Second Circuit teaches in *Morrison* that Defendant must demonstrate that this Court "lacks the statutory or constitutional power to adjudicate it," thereby rendering the Court powerless to adjudicate any claims of Manker, Doe, or all class members. *Morrison*, 547 F.3d at 170.

In the case at bar, Defendant Secretary of the Navy cannot make that showing. The reasons he cites for a lack of subject matter jurisdiction do not, separately or in the aggregate, lead to that

conclusion. They fail in that regard because this Court's statutory power to adjudicate this case is explicitly conferred by the APA.

### 2. *Justiciability and the Intramilitary Immunity Doctrine*

Defendant's first-cited basis for lack of jurisdiction is that "under the intramilitary immunity doctrine, Plaintiffs' challenges to military personnel decisions are generally nonjusticiable." Doc. 67-1, at 15. Defendant seeks to apply that judge-made doctrine to the present Plaintiffs' APA action by arguing: "To the extent that Plaintiffs' claims require the Court to make an individualized inquiry into a discrete personnel action, any such claim is nonjusticiable. The justiciability of military personnel decisions is limited by the fundamental and highly salutary principle that Judges are not given the task of running the Army." *Id.* (citations and internal quotation marks omitted).

One may acknowledge the existence and beneficence of that principle, embodied in the intramilitary immunity doctrine. But the doctrine has nothing to do with the case at bar, which is not "an individualized inquiry into a discrete personnel action" which turns upon "military personnel decisions." *Id.* Rather, this is an action where the plaintiff class invokes the APA to challenge the legality and validity of the process by which the NDRB has denied discharge upgrades to allegedly afflicted veterans. The APA confers jurisdiction on this Court to entertain that action.

Even Defendant quotes with apparent approval *Pettiford v. Secretary of the Navy*, 774 F. Supp. 2d 173, 182 (D.D.C. 2011), stating that "a court's role in reviewing the decision of a military corrections board is to determine whether the decision making process was deficient, not whether [the] decision was correct." *Id.* at 17 (internal quotation marks omitted). That distinction is illustrated by *Kreis v. Secretary of Air Force*, 866 F.2d 1508 (D.C. Cir. 1989), relied upon by Defendant, where the plaintiff, an air force officer who was denied promotion, sued the Secretary

under the APA. In that case, the plaintiff asserted "a claim to a military promotion and distinct claims for the correction of military records." *Kreis*, 866 F.2d at 1511. The D.C. Circuit, reversing in part the district court's dismissal of the action, held that while plaintiff's "request for retroactive promotion falls squarely within the realm of nonjusticiable military personnel decisions," a viable claim lay under the APA to challenge, "in light of familiar principles of administrative law, the reasonableness of the Secretary's decision not to take certain corrective action with respect to appellant's record." *Id*.

The gravamen of the present Plaintiffs' claim against the Navy Secretary is that the process by which the Navy decided not to upgrade class members' discharges was deficient. *Kreis* holds that to be a justiciable claim under the APA. To the same effect, judges in this District routinely hold that the APA grants district courts jurisdiction to consider whether military review boards' classifications of individuals were arbitrary or capricious under section 706(2)(A). *See, e.g.*, *Cowles v. McHugh*, No. 13-cv-1741 (JCH), 2014 WL 12767682, at *5–6 (D. Conn. Sept. 30, 2014). In *Cowles*, the plaintiff challenged the Army Board for Correction of Military Records' refusal "to correct [the plaintiff's] records to reflect that he was separated for PTSD rather than for [Adjustment Disorder]." *Id.* at *1. In denying a motion to dismiss, Judge Hall said that, "[t]his relief is all within the traditional scope of 'equitable' relief, is not merely 'incidental' to the money damage claim, and would thus normally be the appropriate subject of a suit under the APA." *Id.* at *6 (citation omitted).

On the present record, there is no substance to Defendant's contention that the claims asserted against the Secretary of the Navy in this class action are nonjusticiable.

### 3. *Failure to Exhaust Administrative Remedies*

Defendant's second jurisdictional challenge is that to the extent Plaintiffs (Manker, Doe, and

the class members) claim the NDRB failed to follow agency regulations in denying them discharge upgrades, Plaintiffs must first exhaust their administrative remedies. Doc. 67-1, at 17–21. That contention is precluded by the Supreme Court's decision in *Darby v. Cisneros*, 509 U.S. 137 (1993), where a real estate developer filed an APA suit against the Secretary of the United States Department of Housing and Urban Development ("HUD"), alleging that sanctions imposed by HUD violated the agency's regulations. A HUD administrative law judge imposed those sanctions, and agency regulations gave the developer the option of asking the Secretary to review that adverse decision. *See Darby*, 509 U.S. at 141. The developer chose not to exercise the option, however, and simply filed his APA action. *See id.* at 142. The Secretary and HUD "moved to dismiss the complaint on the ground that petitioners, by forgoing the option to seek review by the Secretary, had failed to exhaust administrative remedies." *Id.*

*Darby* rejects that contention. The decision focuses upon section 10(c) of the APA, which enables judicial scrutiny of "final agency action for which there is no other adequate remedy in a court," and further provides that "[e]xcept as otherwise expressly required by statute," agency action "is final for the purposes of this section whether or not" there is an application "for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority." 5 U.S.C. § 704. The *Darby* opinion notes that "appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme." 509 U.S. at 153 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)). The Court then reasoned in *Darby*:

Appropriate deference in this case requires the recognition that, with respect to actions brought under the APA, Congress effectively codified the doctrine of exhaustion of administrative remedies in § 10(c). Of course, the exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA. But where the APA applies, an appeal to "superior agency authority" is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review. Courts are not free to impose an exhaustion requirement as a rule of judicial administration where the action has already become "final" under § 10(c).

509 U.S. at 153–54. "In other words, under *Darby*"—as District Judge Bianco (as he then was) aptly distilled of the Supreme Court's decision—a plaintiff need not seek further review of a final action within the agency before filing suit, unless a specific statute or rule expressly requires otherwise." *Brezler v. Mills*, 220 F. Supp. 3d 303, 322 (E.D.N.Y. 2016).

In the case at bar, Defendant's Reply Brief argues that "Plaintiffs did not file a complaint with the JSRA even though the NDRB explicitly informed them of *their right to do so*. . . . Therefore, Plaintiffs failed to exhaust their administrative remedies by not filing a complaint with the JSRA." Doc. 69, at 6 (emphasis added). The JSRA remedy is created by a Department of Defense instruction that an individual's disagreeing with agency action "may submit a complaint . . . to the Joint Service Review Activity." *Id.* Defendant also argues that "Second Circuit precedent requires them to exhaust their administrative remedies by presenting such claims to the BCNR." *Id*.

These exhaustion contentions are precluded by *Darby*, as correctly interpreted by *Brezler*. No statute or rule expressly required Plaintiffs to invoke JSRA or BCNR remedies before filing this APA action. Defendant does not contend otherwise.

Defendant's theory is that exhaustion is required here because Plaintiffs challenge military personnel decisions. *Id.* Defendant places primary reliance upon *Guitard v. United States Secretary*

-12-

*of the Navy*, 967 F.2d 737 (2d Cir. 1992), where the Second Circuit reversed a preliminary injunction barring the Navy from discharging a member of the Naval Reserve on the ground that the plaintiff had failed to exhaust his administrative remedies. The Second Circuit reasoned that "[u]nder the exhaustion rule, a party may not seek federal judicial review of an adverse administrative determination until the party has first sought *all possible relief* within the agency itself," emphasizing that "[t]he imperatives concerning military discipline require the strict application of the exhaustion doctrine in discharge cases." *Id.* at 740 (emphasis added). The *Guitard* plaintiff does not appear to have filed his action under the APA. *Id.* Defendant also relies upon *Jones v. New York State Division of Military and Naval Affairs*, 166 F.3d 45, 54–55 (2d Cir. 1999)—a non-APA, 42 U.S.C. § 1983 case—where the Second Circuit cited *Guitard.* In that case, the Court of Appeals held that the plaintiff's exhaustion of administrative remedies was a prerequisite to his § 1983 action challenging his removal from service based on the Army National Guard's alleged failure to comply with its own regulations. *See id.* at 55.

Defendant's reliance upon *Guitard* and *Jones* is misplaced. Unlike those cases, Plaintiffs at bar are suing under the APA; and, the Second Circuit's decisions in *Guitard* and *Jones* antedate the Supreme Court's decision in *Darby* limiting the exhaustion of remedy doctrine in APA cases. In *Brezler*, an APA-based action where plaintiff challenged a military disciplinary proceeding against him and separation recommendation, "the government urge[d] the Court to disregard *Darby* and apply *Jones* . . . because the military enjoys a special status reflected in the existence of two systems of justice . . . one for civilians and one for military personnel." 220 F. Supp. 3d at 324 (citation and internal quotation marks omitted). Judge Bianco rejected the Navy's invitation:

> This Court declines to do so. Although the law accords the *sui generis* nature of military life unique deference, the plain language of

-13-

the statute and *Darby*'s dictate, which governs "where the APA applies," 509 U.S. at 154, are dispositive. The Court will not require plaintiff to exhaust all avenues of administrative review of a final agency decision where Congress and the military have not imposed such a requirement.

. . .

Though the government argues that *Jones* stands for the proposition that exhaustion is required for *any* claim based on the military's failure to follow regulations even where the statute under which relief is sought does not require it, the better view is that *Jones* merely reflects that *Darby*, by its own terms, is limited to APA cases. *See Darby*, 509 U.S. at 153–54 ("Of course, the exhaustion doctrine [recognized by the Second Circuit] continues to apply as a matter of judicial discretion in cases not governed by the APA."). . . . *Jones* and *Guitard* are of no moment here because *Darby* and the APA preclude imposition of an exhaustion requirement not found in statute or rule.

*Id.* at 324 (some citations and internal quotation marks omitted).

I agree with Judge Bianco's analysis in *Brezler*.[1] I hold in this case that the Supreme Court's decision in *Darby* and the plain language of the APA preclude the Defendant Secretary of the Navy from imposing an exhaustion of administrative remedy requirement upon Manker, Doe, or members of the Plaintiff class.

### 4.     *Failure to Seek Review by Civilian Review Board*

Defendant specifies as a separate basis for lack of subject matter jurisdiction the fact that Plaintiffs have not sought review of a civilian review board decision. Doc. 67-1, at 21. Defendant's Brief demonstrates that Defendant is referring to the Board for the Correction of Naval Records ("BCNR"), which the Navy established as "the highest level of administrative review within the Department of the Navy," generally composed of a "three-member panel of rotating civilians," with

---

[1] Judge Bianco filed his district court opinion in *Brezler* on December 6, 2016, a time when his opinions were not binding upon me. I agree with *Brezler* because it is persuasive. Judge Bianco was elevated to the Second Circuit on May 17, 2019.

the power to "review an NDRB decision and provide further relief." *Id.* at 6.

Defendant's reference to a BCNR review, while stated separately, is in effect a further invocation of the non-justiciable and exhaustion of remedies doctrines that run through Defendant's briefs like *leitmotivs*. That persistence emerges clearly in Defendant's Reply Brief, where Defendant argues that "[f]ollowing the rationale in *Guitard*, Plaintiffs should have first addressed any of the NDRB's alleged constitutional infirmities with the BCNR before invoking this Court's jurisdiction." Doc. 69, at 6. "*Guitard*" is a reference to *Guitard*, 967 F.2d at 737, which Judge Bianco noted in *Brezler* was "of no moment" since the later-decided *Darby* and the APA "preclude imposition of an exhaustion requirement not found in statute or rule." 220 F. Supp. 3d at 324.

Defendant professes to find, in Navy and Department of Defense regulations, provisions requiring the exhaustion of administrative remedies before *judicial review* of agency action may be sought. Thus, Defendant's Reply Brief states that "Plaintiffs failed to exhaust their administrative remedies by not seeking review by the BCNR," and "the applicable regulations dictate that the Plaintiffs should have sought relief from the JSRA and the BCNR, not just the prudential considerations already detailed in the Defendant's [Main] Brief." Doc. 69, at 7. The regulations in question do nothing of the kind. The Navy regulation, quoted in Defendant's Reply Brief, advises an applicant for agency action that if he or she has "otherwise exhausted their opportunities before the NDRB, the Applicant may petition the Board for Correction of Naval Records . . . for further review." *Id.* (alterations omitted). That sort of permissive internal agency review falls well short of the "expressly required" judicial restrictions specified by the APA, in which, as the Supreme Court noted in *Darby*, "Congress effectively codified the doctrine of exhaustion of administrative remedies in § 10(c)." 509 U.S. at 153.

In the instant case, the Defendant Secretary is contending for what we may call a "military exception" to the decision announced in *Darby*. That exception found favor with the district court in *Saad v. Dalton*, 846 F. Supp. 889 (S.D. Cal. 1994), which dismissed a Naval Reserve officer's action seeking to enjoin her involuntary separation from the military service. That plaintiff could have petitioned the BCNR for relief, but did not do so before filing suit, a failure to act that led to the court dismissing the action. *Id.* at 891. The district court said that "[u]ntil the plaintiff proceeds before a Board established by Congress to resolve military personnel disputes, this court will not address (1) whether the court has the authority to review the claims or (2) if so, the merits of those claims." *Id.* The plaintiff in *Saad* cited *Darby* for the proposition that she "need not exhaust her available remedies" before filing suit, but the court disregarded *Darby* as "clearly distinguishable." *Id.* The court reasoned:

> The *Darby* case involved the interpretation of the Administrative Procedure Act in the context of a Department of Housing and Urban Development administrative ruling. Review of military personnel actions, however, is a unique context with specialized rules limiting judicial review. *Chappell*, 462 U.S. at 301–04.[2] Accordingly, the court dismisses the plaintiff's complaint for failure to exhaust available administrative remedies.

*Id. Saad* holds that military personnel cases fall outside of, or constitute a military exception to, the narrow boundaries of mandated remedy exhaustion the Court specified in *Darby*. I am asked to reach the same conclusion in the case at bar.

I decline to do so because the distinct weight of authority is squarely to the contrary. Judge Bianco dealt with that issue in *Brezler*, a military personnel case where "the government urge[d] the

---

[2] *Chappell v. Wallace*, 462 U.S. 296 (1983).

Court to disregard *Darby* and apply *Jones*[3] to [an] APA action because the military enjoys a 'special status' reflected in the existence of 'two systems of justice . . . one for civilians and one for military personnel." 220 F. Supp. 3d at 324 (quoting *Chappell*, 462 U.S. at 303–04). Judge Bianco declined that invitation, and refused to "require plaintiff to exhaust all avenues of administrative review of a final agency action where Congress and the military have not imposed such a requirement." *Id*. He then reasoned:

> This holding is in harmony with the weight of post-*Darby* case law finding that there is no "military exception" to *Darby*. *See, e.g.,* . . . *Crane v. Sec'y of Army*, 92 F. Supp. 2d 155, 161 (W.D.N.Y. 2000) (collecting cases and observing that, "[a]lmost without exception, federal courts throughout this country have also declined to create a military exception to the Court's decision in *Darby*"). *But see Saad v. Dalton*, 846 F. Supp. 889, 891 (S.D. Cal. 1994).

*Id.*

While Judge Bianco acknowledged in *Brezler* that the *Saad* opinion in the Southern District of California went the other way (preceding his citation to that case with the telltale phrase, "*But see*"), he agreed with those federal courts which, following *Darby*, have "almost without exception" refused to fashion a "military exception" to *Darby*, if the effect of the exception would be to impose upon APA plaintiffs an exhaustion requirement which neither the statute nor the underlying agency regulations contained. *Id.* The conclusion I reach in this case is in accord with that greater weight of authority.

In short, the plain language of section 10(c) of the APA, cast in the broadest possible terms, means just what it says. The case at bar is brought pursuant to the APA. The statute's wording in section 10(c) and the Supreme Court's decision in *Darby* create and define the boundaries of the

---

[3] *Jones v. New York State Div. of Military & Naval Affairs*, 166 F.3d 45 (2d Cir. 1999).

requisite exhaustion of administrative remedies in an action brought pursuant to the APA. They preclude Defendant's contention that any failure by Plaintiffs to exhaust deprives this Court of jurisdiction over their claims. The Court noted in *Darby* that "Congress effectively codified the doctrine of exhaustion of administrative remedies in § 10(c)." 509 U.S. at 153. I cannot accept the outlier district court's conclusion in *Saad*, echoed by the Defendant Secretary in the case at bar, that Congress's codification of exhaustion in the statute created one protocol for HUD cases and none or a different one for military cases.

The *Darby* decision applies to all APA cases. The case at bar is one of them. Defendant is not entitled to challenge the Court's subject matter jurisdiction on the ground of failure to exhaust administrative remedies, or some alternative prudential principle.

### 5.    *Mootness of Plaintiffs' Claims*

Next, the Defendant Secretary asserts that "Plaintiffs' claims concerning the NDRB's application of the Hagel Memo are moot." Doc. 67-1, at 23.

Defendant bases that assertion upon a recitation of essentially undisputed facts appearing in his Main Brief and captioned, "the Hagel Memo and the Evolution of the Liberal Consideration Standard." *Id.* at 6–9. That reference is to the previously noted memorandum issued by then-Secretary Hagel mandating that "liberal consideration" be given to veterans with PTSD and similar mental health conditions, and to records indicating symptoms of those conditions. On this aspect of the case, Defendant stresses that Hagel's Memo was issued on September 3, 2014, to "Military Department Boards for Correction of Military Naval Records" (BCM/NRs), separate and distinct entities from the NDRB, the tribunal to which Manker and Doe addressed their unsuccessful petitions for discharge upgrades. *Id.* at 6–7. On August 25, 2017, Undersecretary of Defense

Anthony Kurta "issued a memo that provided guidance clarifying and expanding upon the Hagel Memo," which "*for the first time*" stated that the Hagel Memo "also applies to both BCM/NRs *and DRBs*." *Id.* at 7–8. By letter dated September 18, 2017, J.A. Riehl, the Director of the Secretary of the Navy Council of Review Boards, directed the NDRB to ensure its compliance with the Kurta Memo. *Id.* at 9.

Defendant's mootness argument proceeds from the proposition that "the Kurta Memo and the Riehl Policy Letter now require the NDRB to apply the Hagel Memo, which is essentially the same relief that Plaintiffs seek from this Court." *Id.* at 23. It follows, the argument concludes, that "as it pertains to the NDRB's application of the Hagel Memo, the issue is moot thereby depriving this Court from having subject matter jurisdiction." *Id.*

It is generally held that "[w]hen a case becomes moot, the federal courts lack[] subject matter jurisdiction over the action." *Fox v. Bd. of Trustees of State Univ. of New York*, 42 F.3d 135, 140 (2d Cir. 1994) (citation and internal quotation marks omitted). However, the question is fact-intensive, and the circumstances of this case do not provide a basis for rejecting subject matter jurisdiction over the Complaint on the ground of mootness.

The essence of Defendant's argument is that, given the chronology of the Hagel, Kurta, and Riehl writings, Manker and Doe's individual claims have become moot, which says nothing about other members of the Plaintiff class, whose claims continue unaffected. In *Kennedy v. Esper*, a comparable case where a certified class of PTSD-afflicted Army veterans sued the Secretary of the Army for disregarding the Hagel Memo, Judge Eginton held that "after the Court has certified a class, the termination of a class representative's claim does not moot the claims of the unnamed members of the class." No. 16-cv-2010 (WWE), 2018 WL 6727353, at *3 (D. Conn. Dec. 21, 2018)

(citation omitted).

Even as to the class representatives, Manker and Doe, individually, Defendant's Reply Brief concedes that "Defendant's argument concerning mootness was limited to the NDRB's application of the Hagel Memo." Doc. 69, at 7 (citation and internal quotation marks omitted). That acknowledged limitation gives the mootness game away. Contrary to Defendant's characterization, Manker and Doe did not file this action for the sole and entire purpose of making the Navy clarify the Hagel Memo's applicability to the service's several boards of review. The conduct of which Manker and Doe complain is the Navy's denying them discharge upgrades. Manker and Doe claim those denials were wrongful because of a number of specified Navy failings and omissions in addition to the disregard of Hagel's "liberal consideration" standard. A litigation claim proximately caused by several challenged forms of conduct is not rendered moot and subject to dismissal in its entirety because one of those causes may be mooted by subsequent developments.

"As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016) (citation and internal quotation marks omitted). "A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (citation and internal quotation marks omitted). Applying these familiar principles, I conclude without difficulty that claims asserted by the named or class Plaintiffs are not beyond the Court's subject matter jurisdiction on the basis of mootness.

**6.      *Plaintiffs' Standing to Challenge the NDRB***

Defendant's next ground for dismissal is that "Plaintiffs lack standing to request broad-sweeping injunctions clearly not authorized by the APA"—relief that is available only if the agency's

actions "were already 'required' and 'discrete.'"  Doc. 67-1, at 24 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004)).  "Here," Defendant continues, "the agency actions Plaintiffs request were neither required nor discrete." *Id.*

Defendant makes two arguments in support of that proposition.  The first is a reprise of Defendant's contention that "the NDRB was not required to apply the Hagel Memo because it did not apply to the NDRB when it considered the named Plaintiffs' petitions." *Id.*  I considered that chronology *supra*, found nothing in it to warrant dismissal of the Complaint, and adhere to that conclusion.

Defendant's second argument is that "the APA allows challenges only to 'discrete action[s],' and does not authorize 'broad programmatic attack[s] against agencies." *Id.* (quoting *Norton*, 542 U.S. at 62–63).  That is a path to perdition, Defendant contends, since appellate courts caution against district courts entering "general orders compelling compliance with broad statutory mandates," lest it become the inappropriate "task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Id.* (quoting *City of New York v. U.S. Dep't of Defense*, 913 F.3d 423, 431 (4th Cir. 2019)).

Plaintiffs respond that their "allegation that the NDRB has systematically denied veterans a fair discharge review process through several errors does not transform Plaintiffs' claims into a 'broad programmatic attack' on agency policy."  Doc. 68, at 33.  Plaintiffs add that "by certifying a nationwide class action, the Court necessarily concluded that the harms were both numerous and common to the proposed nationwide class." *Id.* at 34.

These conflicting contentions implicate the Court's subject matter jurisdiction.  Plaintiffs'

action against the Secretary of the Navy constitutes a suit against the United States.  The question of the government's sovereign immunity from suit arises.  "Sovereign immunity is jurisdictional in nature" and "[a]bsent a waiver . . . shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1984).

In that regard, Plaintiffs invoke the APA.  "The APA waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief 'other than money damages.'"  *City of New York*, 913 F.3d at 430 (quoting 5 U.S.C. § 702).  "Judicial review under the APA, moreover, is limited to 'final agency actions.'"  *Id.* (quoting 5 U.S.C. § 704).  "As these provisions of the APA make plain, subject matter jurisdiction is lacking if the plaintiff fails to challenge a particular 'agency action' that is fit for review.  The term 'action' as used in the APA is a term of art that does not include all conduct on the part of the government. . . . [T]he Administrative Procedure Act does not provide review for everything done by an agency."  *Id.* at 430–31 (citations and internal quotation marks omitted).

Because the APA is a limited waiver of sovereign immunity, a district court must initially determine on which side of the line a particular action invoking the APA falls: "fit for review" within the statute's limitations (and thus within the court's subject matter jurisdiction), or non-reviewable (so that jurisdiction is lacking).  That preliminary analysis is not necessary when the government's waiver of sovereign immunity is more broadly stated.  For example, the "[w]aiver of immunity" section of the Public Vessels Act provides simply that in cases within the district court's admiralty jurisdiction, "[a] civil action in personam in admiralty may be brought, or an impleader filed, against the United States for . . . damages caused by a public vessel of the United States."  46 U.S.C. § 31102(a)(1).  The APA is more narrowly drawn.  The threshold question is whether the class action

at bar falls within the boundaries of that statute's sovereign immunity waiver.

On that issue, the case at bar bears a significant resemblance to *Ramirez v. United States Immigration and Customs Enforcement*, 338 F. Supp. 3d 1 (D.D.C. 2018), where three immigrant teenagers who entered the United States as unaccompanied alien children brought a purported class action under the APA against the United States Immigration and Customs Enforcement ("ICE") agency. The plaintiffs alleged that when they reached their eighteenth birthdays, ICE transferred them to adult detention centers without considering less restrictive placements, in violation of a relevant act of Congress. *See id.* at 11. The plaintiffs also contended that the defendants "routinely and systematically fail[ed] to abide by this statutory provision." *Id.* These three plaintiffs sought certification of a class defined as "[a]ll former unaccompanied alien children who are detained or will be detained by ICE" after such transfers and "as to whom ICE did not consider placement in the least restrictive setting available," as required by statute. *Id.* at 43. The district court denied the government's motion to dismiss plaintiffs' complaint and granted plaintiffs' motion for the prayed-for class certification. *Id.*

In an earlier opinion, *Ramirez v. United States Immigration & Customs Enforcement*, 310 F. Supp. 3d 7, 34 (D.D.C. 2018), the district court granted the individual plaintiffs' motion for a preliminary injunction. Opposing that motion, the government defendants "contest[ed] whether Plaintiffs have identified any 'agency action' subject to judicial review pursuant to the APA"; and, "[t]hey contend[ed] that 'Plaintiffs' claims constitute[d] a generalized complaint that the agency [was] not properly following the statute in their cases.'" *Id.* at 20. That is the argument the Secretary of the Navy makes in this case.

District Judge Contreras rejected that contention. According to the court, "the decisions of

where to place Plaintiffs . . . after they were transferred to DHS custody constitute agency action for APA purposes." *Id.* The court reasoned:

> Plaintiffs in this case have not lodged a generalized attack, as Defendants assert. Plaintiffs are not seeking wholesale change to an entire federal program . . . . Nor are they requesting that this Court inject itself into the day-to-day agency management. . . . Rather, Plaintiffs in this case seek to compel an agency to take the discrete and concrete action of considering statutorily specified factors in determining where and how to place them—and similarly situated others—now that they have aged out of HHS's care and custody. Defendants confuse *aggregation of similar, discrete purported injuries*—claims that many people were injured in similar ways by the same type of agency action—for *a broad programmatic attack.* The Court sees Plaintiffs' claims differently.

*Id.* at 21–22 (emphases added and citation omitted). In the instant case, the Secretary of the Navy has fallen prey to the same confusion. The claims of the veterans in this case—that the Navy failed to consider specified factors in determining whether to upgrade their discharges—mirror the claims of the alien teenagers in *Ramirez* that ICE failed to consider factors in determining their placement. Both classes of claims are cognizable under the APA.

When *Ramirez* subsequently returned to the district court on motions to dismiss and for class certification, the defendants again questioned—"just as they did at the preliminary injunction stage of this litigation—whether Plaintiffs have identified final agency action that is subject to review under the APA." *Ramirez*, 338 F. Supp. 3d at 39. Judge Contreras adhered to his earlier conclusion that the agency's conduct was reviewable under the APA. He restated his reasoning:

> Plaintiffs have not lodged a generalized attack, seeking wholesale change to a federal program. They instead seek to compel Defendants to conduct the inquiry mandated by statute before determining where to place each former unaccompanied minor now in DHS's care and custody. Approaching finality pragmatically, this Court reasoned that Defendants had consummated a decision-making process by failing to consider each Plaintiff for less restrictive placements as required

-24-

> by the statutory provision and that legal consequences flowed from those failures. . . . Thus, the Court again concludes that this suit concerns final agency action reviewable under the APA.

*Id*. at 40–41. Judge Contreras's opinions in *Ramirez* are not binding on me, but they are persuasive, and his reasoning applies squarely to the issues presented by this case.

Defendant's contention that Plaintiffs impermissibly "launch a broad programmatic challenge against the Navy Discharge Review Board," Doc 67-1, at 24, depends principally upon two Supreme Court decisions: *Norton*, 542 U.S. at 64, and *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). Neither case supports the proposition that the NDRB's conduct alleged in the Complaint may fairly be characterized in that fashion.

The *Norton* plaintiffs sought to compel agency action "unlawfully withheld or unreasonably delayed" as those phrases are used in 5 U.S.C. § 706(1) of the APA. *See Norton*, 542 U.S. at 57. With respect to complaints that an agency failed to act, the Court held in *Norton* that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Id.* at 64. The Court found in the case no "agency action" subject to judicial review where plaintiff complained that an agency's decision to permit use of off-road vehicles on certain land violated the agency's mandate to "continue to manage [that land] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness." *Id.* at 65. The Court explained that "compelling compliance with broad statutory mandates" would "inject[] the judge into day-to-day agency management," an impermissible result since "[t]he prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA." *Id.* at 65–67.

The Court's opinion in *Norton* notes that its "limitation to discrete agency action precludes

the kind of broad programmatic attack we rejected in *Lujan*. . . . There we considered a challenge [to the agency's] land withdrawal review program, couched as unlawful agency 'action' that the plaintiffs wished to have 'set aside' under [APA] § 706(2)." *Id.* at 64. The Court in *Lujan* refused to consider that claim under the APA, reasoning that unless Congress explicitly provides otherwise, courts may "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect"—particular circumstances the Court could not discern in the *Lujan* complaint. 497 U.S. at 894. The Court reached that result in *Lujan* because, in its view, an APA plaintiff "cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.* at 891.

The class action that *Ramirez* holds to be cognizable under the APA more closely resembles the case at bar than the complaints in *Norton* and *Lujan*, which did not pass APA muster. Judge Contreras said in *Ramirez* that "[p]laintiffs are not seeking wholesale change to an entire federal program like the plaintiffs were in *Lujan*. Nor are they requesting that this Court inject itself into the day-to-day agency management, as the plaintiffs were in *SUWA*." 310 F. Supp. 3d at 20. Nor, for that matter, are the class member Plaintiffs in the case at bar seeking either of those forbidden objectives.

Each individual member of the certified class of discharged Navy or Marine Corps veterans claims that the NDRB wrongfully failed to consider or comply with specified statutorily or regulatory factors, with the result that the veteran's application for a discharge upgrade was impermissibly denied. Each denial of a class member's upgrade application constitutes a particularized agency action with respect to that veteran. A significant number of such agency

actions gave rise to an "aggregation of similar, discrete purported injuries" and resulting "claims that many people were injured in similar ways by the same type of agency action." *Ramirez*, 310 F. Supp. 3d at 21.

As the district court correctly held in *Ramirez*, that aggregation of specific and discrete claims is reviewable under the APA. *See id.* at 23. A complaint asserting them may not be dismissed as a "broad" and "programmatic" attack upon a federal agency of the sort rejected by *Norton* and *Lujan*, decisions which bear no meaningful resemblance to the case at bar.

For the foregoing reasons, I reject the Secretary's several contentions that the conduct of the NDRB alleged in the Complaint cannot be subjected to judicial review under the APA. Accordingly, this Court has subject matter jurisdiction to consider the merits of the case.[4]

**7.      *Injunctive Remedies Sought by Plaintiffs***

An additional consideration may be noted here, although it relates more to remedy than jurisdiction.

Defendant argues in his Reply Brief that Plaintiffs cannot request injunctive relief because they "do not present claims under § 706(1) [of the APA]." Doc. 69, at 9. It is true that all the claims in the Complaint (class and individual) are pleaded under § 706(2) of the APA. Doc. 1 ¶¶ 208–09, 212–13, 221, 227, 234, 241. However, I am not prepared to hold on this motion to dismiss that, whatever the proof may eventually demonstrate, the Court could not fashion relief in the form of an injunctive order.

---

[4] Attention must be paid to further facts that may be developed during discovery. The question of a district court's subject matter jurisdiction is of continuing concern. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Judge Eginton considered the availability of injunctive relief in the comparable Army case under the APA, where he observed that the APA provides for "any applicable form of legal action, including . . . mandatory injunction." *Kennedy*, 2018 WL 6727353, at *3 (citing 5 U.S.C. § 703). Judge Eginton cited to the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988), and explained that "circumstances may make it appropriate for judicial review to culminate in the entry of declaratory or injunctive relief that requires the Secretary to modify future practices." *Id.* (internal quotation marks omitted).[5]

Judge Eginton applied those principles in the Army case, where "[p]laintiffs have requested that the Court's injunction rectify the ADRB's failure to apply the decisional standards already established by the Hagel Memo and now codified at 10 U.S.C. § 1553." *Id.* (internal quotation marks omitted). That same relief is sought by the plaintiffs in this case, against the NDRB. Judge Eginton concluded in the Army case:

> This Court has jurisdiction to consider a lawsuit seeking redress where a military entity has failed to follow mandatory regulations resulting in prejudice to a service member. The Court will determine the scope of the any injunctive relief, if appropriate, at a later stage of this action.

*Id.* (citation omitted). Those are correct and sensible conclusions. I agree with them, and will proceed in the same manner in the case at bar.

## B. Failure to State a Claim

Defendant's motion under Rule 12(b)(6) to dismiss Plaintiffs' complaint for failure to state a claim is based solely upon Defendant's perception of "Plaintiff's incorrect legal conclusion that

---

[5] In the case at bar, counsel for Plaintiffs contended at oral argument that "[t]here is no rule that a 706(2) case precludes injunctive relief. And courts often enjoin agencies from taking unlawful action on 706(2) cases." Doc. 71 (Transcript of Oral Argument), at 39 ¶¶ 17–20.

the Hagel Memo applied to the NDRB when it reviewed the named Plaintiffs' petitions." Doc. 67-1, at 27. "Under the plain language of the Hagel and Kurta Memos," Defendant's argument continues, "the Hagel Memo did not apply to the named Plaintiffs when the NDRB considered their petitions." *Id.* His argument concludes that, reading the Hagel and Kurta Memos together, the DRBs—a group of entities that includes the NDRB—"were not required to apply the Hagel Memo guidance until DoD issued the Kurta Memo." *Id.* at 29. As such, according to Defendant, "any claim based on the incorrect legal conclusion that the Hagel Memo applied to the DRBs prior to the Kurta Memo fails to state a claim for which relief can be granted." *Id.*

The chronology of the Hagel and Kurta Memos is recounted in Part II.A.5, *supra*, which discussed Defendant's Rule 12(b)(1) jurisdictional challenge based on mootness. Defendant repeats that chronology in the present Rule 12(b)(6) context. It is necessary to restate and expand somewhat upon the relevant facts.

Secretary of Defense Hagel issued his "liberal consideration" Memo on September 3, 2014. The Hagel Memo was addressed to "Secretaries of the Military Departments." Its subject was stated in a caption as: "Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder." In the case at bar, the Defendant Navy Secretary says that those Boards "are authorized under 10 U.S.C. § 1552," and the Hagel Memo "did not apply to Discharge Review Boards, which are authorized under 10 U.S.C. § 1553." Doc. 19, at 5.

On February 24, 2016, Deputy Under Secretary of Defense Brad Carson sent a Memo, similarly addressed and captioned, which referred to the "Supplemental Guidance" contained in the Hagel Memo, stressed its importance, instructed "the BCMRs/BCNR" to waive any applicable

statutes of limitations that would bar application of the Guidelines, and added:

> Similarly, cases considered previously, either by Discharge Review Boards, or by BCMRs or the BCNR, but without benefit of the application of the Supplemental Guidance, shall be, upon petition, granted de novo review utilizing the Supplemental Guidance.

Doc. 19-1, at 2. Defendant at bar says in his Brief Opposing Class Certification: "Like the Hagel Memo, the Carson Memo only applied to BCMRs and BCNR, not the Discharge Review Boards." Doc. 19, at 6.

On December 23, 2016, Congress added subsection (d)(3) to 10 U.S.C. § 1553. That new provision required Discharge Review Boards to review cases with "liberal consideration" where "post-traumatic stress disorder or traumatic brain injury potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the member's discharge or dismissal." 10 U.S.C. § 1553(d)(3)(A)(ii). Defendant's Brief Opposing Class Certification states: "After this provision was enacted, NDRB began applying and specifically referencing the liberal consideration standard under 10 U.S.C. § 1553(d)(3) to applications that met the applicable criteria." Doc. 19, at 7.

On August 25, 2017, Under Secretary of Defense A.M. Kurta sent a Memo to the Military Department Secretaries which, Defendant's Brief acknowledges, "applied to both Military Discharge Review Boards and Boards for Correction of Military/Naval Records." *Id.* at 7. In that regard, the attachment to the Kurta Memo contains the "clarification" that the Carson Memo "applies in full to BCM/NRs but also applies to DRBs with regards to de novo reconsideration of petitions previously decided without the benefit of all applicable supplemental guidance." Doc. 1-2, at 5 ¶ 23. The Kurta Memo attachment gave detailed comments with respect to the implementation of what has come to be known as "liberal consideration."

Obedient to that communication, on September 18, 2017, J. A. Riehl, the Secretary of the Navy Council of Review Boards, sent to the President of the NDRB and legal counsel of the Council a letter enclosing the Kurta Memo and instructing that "[e]ffective immediately, the Naval Discharge Review Board will ensure implementation of the guidance set forth in the enclosure in its review of all cases either pending adjudication or received in the future," and must also include that guidance "in the NDRB training curriculum to ensure that all board members are familiar with and apply the guidance when voting cases." Doc. 19-1, at 4.

The applications of Manker and Doe to the NDRB for discharge upgrades—and the rejection of both by that Board—may be fixed within this regulatory and statutory time frame. Manker filed his application on June 24, 2016. Doc. 72-1, at 18. Doe filed his on June 2, 2016. Doc. 72-4, at 4. The Hagel Memo had been issued in September 2014, before both applications. Defendant asserts that "[i]n November 2016, just prior to Congress requiring DRBs to review PTSD cases with liberal consideration and well before the DoD issued the Kurta Memo, the NDRB considered both named Plaintiffs' petitions for changes to their respective characterizations of service." Doc. 67-1, at 11. While at that time of consideration the Kurta Memo still lay in the future, the Carson Memo had been issued almost one year earlier, in February 2016. Doc. 19-1, Exs. 1, 2. The NDRB's "final decision" denying Manker's application for a discharge upgrade is dated December 20, 2016. Doc. 72-1, at 2. The NDRB's "final decision" denying Doe's application is dated January 30, 2017. Doc. 72-4, at 1. As of those dates of decision, the Hagel and Carson Memos had been issued. On December 23, 2016, three days after the agency decision denying a discharge upgrade to Manker and five weeks before the agency decision denying that relief to Doe, Congress had enacted the provision which codified the requirement that DRBs apply the Hagel Memo's liberal consideration standard.

*See* 10 U.S.C. § 1553(d)(3)(A)(ii).

The NDRB decision in Manker's case, according to the Administrative Record, recites that "[a]s a result of the Applicant's claim of PTSD or TBI," in accordance with the Hagel Memo dated September 3, 2014, "the NDRB included a member who is a physician, clinical psychologist, or psychiatrist." Doc. 72-1, at 6. The agency decision denying Manker's application for a discharge application is accompanied by an addendum captioned "Information for the Applicant" which recites: "For all claims involving PTSD and/or TBI, the NDRB's review implemented the guidance set forth in the SECDEF Memorandum of 3 September 2014." *Id.* at 11. The reference is to the Hagel Memo—Hagel having been Secretary of Defense ("SECDEF") on that date. The NDRB decision in Doe's case contains the same recitations. Doc. 72-4, at 5, 7.

The NDRB decisions went on to reject Manker and Doe's factual contentions that PTSD and related medical conditions caused or contributed to the misconduct for which these Plaintiffs received less-than-Honorable discharges. The Complaint alleges that with respect to both Manker and Doe, the Defendant Navy Secretary (acting through the NDRB) failed to give "liberal consideration" to PTSD and TBI diagnoses "as directed by the Hagel Memo" and also violated related but separate rules and procedures. Doc. 1 ¶¶ 230, 237.

There is nothing in these circumstances to justify a conclusion that the Complaint or any part of it fails to state a claim upon which relief can be granted, that being the requisite for a Rule 12(b)(6) order of dismissal. Defendant's Rule 12(b)(6) motion appears to be concerned only with the claims of the two named plaintiffs, Manker and Doe. As to them, Defendant argues: "Under the plain language of the Hagel and Kurta Memos, the Hagel Memo did not apply to the named Plaintiffs when the NDRB considered their petitions." Doc. 67-1, at 27. That plainness of language appears

to have eluded the members of the NDRB itself, who were careful to state in both decisions that in its reviews of the applications of both Manker and Doe, the NDRB was acting "in accordance with" the Hagel Memo and "implemented the guidance" that the Hagel Memo addressed to its readers. Doc. 72-1, at 6, 11.

Plaintiffs respond in their Opposition Brief that the Carson Memo, issued almost two years before the NDRB came to consider Manker and Doe, "may well [have been] the reason why the NDRB *itself* treated the Hagel Memo as binding in the decisions regarding Mr. Manker and Mr. Doe." Doc. 68, at 38. That is speculation on counsel's part. Given the tenor of the Carson Memo, however, it is not implausible. What *is* clear is that whether, at the times the NDRB considered the Manker and Doe applications, the NDRB regarded itself as required to act in accordance with the Hagel Memo's guidance is at the very least a factual issue that can be explored in discovery. On the present record, that question cannot be answered in the negative as the basis of dismissal for failure to state a claim, particularly since "for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That mandate extends to the factual allegations in the Complaint at bar—*i.e.*, that at the times the NDRB considered the applications of Manker and Doe, the NDRB "failed, as directed by the Hagel Memo" to give those PTSD-afflicted veterans the benefit of the "liberal consideration" described in the Memo. Doc. 1 ¶¶ 230, 237.

Accordingly, it follows that the claims of Manker and Doe cannot be dismissed on a motion to dismiss where the motion depends upon the parsing of this chronology in a manner favorable to Defendant but not compelled by the record. Defendant's Rule 12(b)(6) motion to dismiss the claims of those two named Plaintiffs will be DENIED.

Defendant's Rule 12(b)(6) motion is not even arguably applicable to all the significant number of additional plaintiffs, namely, the members of the class this Court has certified. Defendant's motion to dismiss depends entirely upon when the Hagel Memo and its progeny became binding upon DRBs like the NDRB. Assuming without deciding that Defendant is correct that this did not occur until the Kurta Memo was issued, the class consists of veterans who served in the Navy or Marine Corps from 2001 to the present. The denial of discharge upgrades to at least some of these veterans must have occurred at a time when even the Defendant would concede that the Hagel Memo applied to them. A motion to dismiss cannot be fashioned of such stuff as this. Defendant's Rule 12(b)(6) motion will be DENIED in its entirety.

## C.    Voluntary Remand

"In the alternative, the Defendant requests that the Court remand this matter to the Navy for further administrative action." Doc. 67-1, at 29. Plaintiffs oppose a remand.

The remand of a case to the lower tribunal from whence it came is a relatively rare creature of appellate practice. An appellate court's remand "sets the judgment aside and sends the case back to the lower court for further proceedings, rather than entering or directing entry of judgment for the appellant or petitioner." *Stutson v. United States*, 516 U.S. 163, 177 (1996) (Scalia, J., dissenting). When a case is remanded by the Supreme Court, Justice Scalia's dissent in *Stutson* notes that "such an order has acquired the acronym "GVR"—for the Court *grants* certiorari, *vacates* the judgment below, and *remands* for further proceedings." *Id.* (footnote omitted).

In the case at bar, a careful reading of Defendant's Brief indicates that the voluntary remand Defendant contemplates is, in one respect at least, narrow in scope. Defendant states that he "requests that the Court grant [his] motion to voluntarily remand the case to the agency for further

action and stay proceedings until the Navy renders a decision." Doc. 67-1, at 31. The immediately following discussion seems to say that the agency's "further action" and "decision" Defendant has in mind is limited to further consideration by the NDRB of Manker's and Doe's petitions for discharge upgrades, and possible revised decisions in their favor alone. *Id.* at 31–33.

Thus, when Defendant begins his discussion on "Voluntary Remand" with the sentence, "Plaintiffs contend that the NDRB failed to apply the Hagel Memo when evaluating their petitions to upgrade their characterizations of service based on claims involving PTSD," Defendant is talking about Manker and Doe. *Id.* at 31. Defendant's discussion continues: "After the NDRB considered Plaintiffs' petitions, DoD issued the Kurta Memo that explicitly made the Hagel Memo applicable to DRBs." *Id.* Defendant adds, "[l]ikely to be beneficial for *both Plaintiffs*, the Kurta Memo provides the following instructive guidance." *Id.* (emphasis added). "Both Plaintiffs" are Manker and Doe. Defendant's Brief reflects upon the several ways in which the contents of the Kurta Memo, "likely favorable to both Plaintiffs," might cause the NDRB to reevaluate favorably the previously rejected petitions of Manker and Doe. That makes the case, in Defendant's view, for a remand by this Court to the Navy of the claims of Manker and Doe: "Allowing the Navy to apply this [Kurta Memo] guidance now to Plaintiffs' petitions may very well obviate the need for judicial review and relief. . . . The NDRB's reevaluation of the evidentiary matters in light of the Hagel Memo and the Kurta Memo may result in the substantive relief that the Plaintiffs now seek from this Court." *Id.* at 32–33.

Defendant anticipates that following such remand of the Manker and Doe petitions, "it will take the NDRB approximately 180 days to issue a decision." *Id.* at 33. Defendant suggests that "within 30 days after final action by the Navy, the parties will file with the Court a copy of the new

decisions," at which point "the Court can decide if further litigation is necessary or, if necessary, Plaintiffs need to first exhaust their administrative remedies by seeking relief from BCNR before returning to the courts." *Id.*[6]

As noted, the Defendant also suggests that the Court "stay proceedings until the Navy renders a decision" on remand. *Id.* at 31. That part of the request is broadly stated. Presumably Defendant means that this entire class action should be stayed pending remand of the Manker and Doe petitions, although that is not clear. A reader of only the remand section in Defendant's Brief would have no idea that the Court had certified a class of thousands of veterans.

The question that arises is whether, in the context of this class action, Manker and Doe's individual claims should be remanded to the agency for reconsideration in the light of the Kurta Memo, with Court proceedings on those claims stayed in the interim. In APA cases, where a plaintiff challenges agency action as arbitrary or capricious, remands to the agency for reconsideration frequently occur, as I had occasion to note in a prior discovery ruling in this case. *See Manker*, 2019 WL 1506654, at *4 (citation omitted); *see also I.N.S. v. Orlando Ventura*, 537 U.S. 13, 16 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands.").

Remanding Manker and Doe's petitions to the NDRB for reconsideration serves the interests of justice in those particular cases. These two veterans continue to be prejudiced by their less-than-Honorable discharges. If they are entitled to upgrades to Honorable (on which the Court neither expresses nor intimates a present opinion), that continued deprivation constitutes a serious injustice.

---

[6] That latter suggestion may be disregarded because this Ruling concludes that Plaintiffs' APA action is not barred by a failure to exhaust administrative remedies. *See supra* Part II.A.4.

For the purpose of the remand issue only, I assume without deciding that, as Defendant contends, the Hagel Memo was not applicable to the NDRB until the Department of Defense issued the Kurta Memo. Counsel for Defendant describe in their Brief the several ways in which the guidance articulated by the Hagel and Kurta Memos, on this assumption newly available to the NDRB, might result in the NDRB reevaluating and granting the petitions of Manker and Doe. I regard those aspects of counsel's discussions as reflective of professional analysis, rather than exercises in advocacy intended to achieve a particular result on this motion.

What the NDRB would make of the Kurta Memo, new to that panel, on remand is a different question. But it is clear that if the groundwork for decisions favorable to Manker and Doe has, in fact, been laid, those decisions should take place sooner rather than later. Remand is the vehicle by which that result, by definition consistent with justice, would be achieved. No circumstance argues against remand of these individual claims.[7]

The Court will therefore make an Order of Remand in this case with respect to the petitions of Plaintiffs Manker and Doe for discharge upgrades. However, there is neither a basis for, nor justice in staying, the entire class action while that limited remand goes forward. While class members allege injuries similar to those of Manker and Doe (less-than-Honorable discharges related

---

[7] If on remand the NDRB upgrades the discharges of Manker and Doe to Honorable, those individuals may no longer qualify as representatives of the Plaintiff class. However, as noted *supra*, Judge Eginton observed that "after the Court has certified a class, the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Kennedy*, 2018 WL 6727353, at *3; *see also Amador v. Andrews*, 655 F.3d 89, 100 (2d Cir. 2011) (rejecting the defense of mootness and noting that after a plaintiff class had been certified, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class," in part, because "it was certain that a continuing class of similarly situated persons would suffer the constitutional harm alleged" (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)). Should the need arise, replacement class representatives could presumably be identified. If upon remand the NDRB refuses to upgrade the discharges of Manker and Doe, that need would not arise.

to PTSD and TBI), no class member's claim will be affected by further Navy decisions on Manker's or Doe's claims. The class members are entitled to as prompt a resolution of their claims as the circumstances and exigencies of case administration allow. The stay of proceedings accompanying the remand order will apply only to the individual claims asserted by Manker and Doe.

That leaves for decision the disputes relating to pre-trial discovery, which are discussed in the next Part.

## III. <u>DISCOVERY</u>

During the earliest days of this litigation, a dispute arose as to the proper nature and scope of pre-trial discovery. At that time, when Defendant contemplated but had not made a motion to dismiss the action or remand the named Plaintiffs' claims to the agency for further administrative action, Plaintiffs declared their intention and right to conduct discovery on all matters related to the causes of action and defenses raised in the pleadings. That comprehensive concept implicated numerous Navy policies, procedures, and practices related to discharge upgrade applications. Defendant, in stark contrast, took the position that this being an APA case where Manker and Doe were the named Plaintiffs, permissible discovery was limited to the agency administrative records of those two individuals (not yet produced). I had occasion in the prior ruling to observe: "Stated briefly, discovery is visualized by Plaintiffs into practically everything and by Defendant into almost nothing." *Manker*, 2019 WL 1506654, at *2.

Since then, the Navy produced the administrative records generated by the NDRB's denials of the applications by Manker and Doe; Defendant made his motion to dismiss or remand; and the Court, in the preceding parts of this Ruling, has denied the motion to dismiss and declined to remand the entire class action.

I do not understand these developments to alter the parties' previously expressed contentions with respect to the appropriate boundaries of discovery. Docs. 61, 62. I resolve that issue by concluding that pre-trial discovery in this ongoing class action is not, and in fairness could not be, limited to the administrative records created by the unsuccessful agency applications of Manker and Doe for discharge upgrades.

On this aspect of the case, I agree with Judge Eginton's opinion on discovery in *Kennedy*. The complaint in *Kennedy* was filed in 2016 by two named Army veteran plaintiffs (Kennedy and Carson, the Army equivalents of Manker and Doe in this case). *See Kennedy*, 2018 WL 6727353, at *2. In the Army case, Judge Eginton had previously denied the defendant Secretary's motion to dismiss the complaint, and certified a class of plaintiffs comparable to the class that this Court certified in the instant case in 2018—*i.e.*, veterans who served between October 7, 2001, and the present and received less-than-Honorable discharges. *See id.* at *7. With the Army case in that posture, the proper scope of discovery became an issue. The Secretary argued that discovery should be limited to the administrative records for the two named plaintiffs, a contention that Judge Eginton rejected in a discovery order, which I will quote:

> On August 28, 2019, defendant filed an administrative record reflecting the administrative reviews for both plaintiff Kennedy and Carson. Plaintiffs represent that the extant administrative record of the two plaintiffs is insufficient to allow the Court meaningful review of their APA claims challenging systemic failures to implement the law and official directives or guidance. Where a plaintiff challenges an agency's general course of conduct rather than a discrete adjudication, limited discovery outside of the administrative record may be necessary where the administrative record does not contain evidence of the challenged action. The Court should permit only discovery necessary to effectuate the Court's judicial review. Here, plaintiffs maintain that course of conduct evidence is not generally part of an individual's administrative record.

> In light of the nature of plaintiffs' challenge in this action, the Court will allow plaintiffs to conduct discovery outside of the administrative record.

*Kennedy*, No. 3:16-cv-2010, slip op. at 2–3 (D. Conn. Sept. 6, 2019) (citations omitted). Judge Eginton's order concluded by directing the parties "to confer and file a proposed discovery plan that addresses the scope of the discovery sought and that proposes an agreed upon schedule." *Id.* at 3. Judge Eginton also "refer[red] th[e] case to Magistrate Judge Spector to supervise the discovery in th[e] action." *Id.* at 4.

In the case at bar, this Court has also denied a defense motion to dismiss (in this Ruling) and certified a Plaintiff class (in an earlier ruling). This case is accordingly in the same posture as *Kennedy* when Judge Eginton issued his discovery order. I agree with Judge Eginton's resolution of the discovery issue, cannot improve upon his reasoning, and make the same order in this case.

The Court allows plaintiffs to conduct discovery outside the administrative record generated by the Manker and Doe applications. An Order of Reference will be made to Magistrate Judge Spector, who will supervise discovery in this case, as well as in *Kennedy*, the Army case.[8]

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that this class action on behalf of Navy and Marine Corps veterans against the Secretary of the Navy, which challenges the denial of class Plaintiffs' applications for upgrades of their discharges from military service, may go forward.

The action, brought under the APA, falls within the Court's subject matter jurisdiction. The

---

[8] In a conversation several days before he died, Judge Eginton agreed with the undersigned that it was sensible to enlist the abilities of Magistrate Judge Spector in the Navy case as well as the Army case, given that the two cases present the same issues and trial counsel of record are mostly the same. It is notable, though not surprising, that this fine judge and good man was engaged in the governance of his cases until, quite literally, the end of his life.

Court makes an Order of Remand, limited to the two named Plaintiffs. Ongoing discovery, which will not be limited to those Plaintiffs' administrative records, will be supervised by a Magistrate Judge.

In these circumstances, the Court makes this Order:

1.  Defendant's motion to dismiss the Complaint [Doc. 67] is DENIED.

2.  Defendant's alternative motion for a remand [Doc. 67] is GRANTED IN PART, in that the applications of Plaintiffs Manker and Doe for discharge upgrades are remanded to the Naval Discharge Review Board ("NDRB") for further administrative consideration. Otherwise, Defendant's motion for a remand is DENIED.

3.  The NDRB must issue its decisions following the consideration on remand not later than March 7, 2020. Counsel for Defendant had suggested 180 days, or six months, within which to arrive at such decisions. That is unreasonably long. When the decisions on remand are issued, counsel for the Parties are directed to file them with the Court forthwith.

4.  Proceedings with respect to the claims of Manker and Doe are STAYED pending decisions on the remands directed in paragraph two of this Order. No other proceedings are stayed.

5.  Discovery in this case is not limited to the administrative records generated by the applications of Manker and Doe. Discovery will be supervised by Magistrate Judge Spector pursuant to a separate Order of Reference.

It is SO ORDERED.

Dated: New Haven, Connecticut
        November 7, 2019

                                      /s/ Charles S. Haight, Jr.
                                      CHARLES S. HAIGHT, JR.
                                      Senior United States District Judge