

United States Department of Justice

*United States Attorney*
*District of Connecticut*

---

*Connecticut Financial Center*   *(203) 821-3700*
*157 Church Street, 25th Floor*   *Fax (203) 773-5376*
*New Haven, Connecticut  06510*   *www.justice.gov/usao-ct*

February 25, 2020

The Honorable Robert M. Spector
United States Magistrate Judge
District of Connecticut
141 Church Street
New Haven, CT 06510

Re:   *Manker v. Modley*, No. 3:18-cv-372-CSH
      Response to Plaintiffs' Letter Brief, ECF No. 112

Dear Judge Spector:

     We represent the defendant in the above-reference matter and write in response to plaintiffs' letter brief, ECF No. 112, filed yesterday.

     Defendant writes to clarify the issues in dispute and to request the Court's assistance with resolving this matter.

     Given that this is an APA case, generally it is not subject to discovery, but Rule 26 can nevertheless serve as a guide.  Since the parties in this case and *Kennedy v. McCarthy* (No. 3:16-cv-2010 (CSH)) are each represented by the same counsel, last week's settlement negotiations in *Kennedy* informed defendant's analysis of the issues below.

     As the Court is aware, this specific dispute arose when plaintiffs, on January 31, 2020, first requested the Navy turn over 100 unredacted NDRB applications by February 8, 2020, a feat that was not only impossible but also raised serious concerns for the Navy.  Plaintiffs claimed the materials were critical to receive before settlement, but waited over two months to request production of the voluminous materials, creating a very short timeframe for location, production, and examination before the settlement conference (which was then rescheduled).

     At the Navy's request, plaintiffs elaborated on the relevance of the request by e-mail on February 6, 2020.  As in ECF 112, plaintiffs specifically stated that the information was relevant to the settlement proposal, and the claims they must prove to prevail on their complaint.  Plaintiffs stated that the information would be used to conduct a statistical analysis, and intimated that they would present it as evidence, which correspondingly requires that they disclose the allegedly relevant statistical analysis to defendant.  Plaintiffs' counsel made the same representations in *Kennedy*.

The day before the *Kennedy* settlement conference, defense counsel asked plaintiffs' counsel when defendant would receive a copy of the statistical analysis. Plaintiffs refused to produce it, and appeared to claim that the application materials were used in a consulting witness expert report, rather than one subject to disclosure pursuant to Rule 26.

Having participated in the *Kennedy* settlement conference, it then appears that (1) the information will not be used to inform settlement discussions, at least as far as educating the defendant as to weaknesses in its position or areas in which it could improve; and (2) plaintiffs do not intend to proffer the statistical analysis to prove any fact that is relevant to the claims or defenses in the case. Or, if the plaintiffs intend to offer a statistical analysis, it will not be offered prior to the settlement conference, which undercuts the need for the information (the applications) prior to settlement discussions.

Yesterday, shortly after plaintiffs filed ECF 112 in this case, defense counsel requested to know the factual basis for the second sentence below:

> First, Defendant claims that statistical analyses were not used to inform discussions in the Kennedy v. McCarthy (No. 3:16-cv-2010 (CSH)) settlement conference on February 19, 2020. **In fact, the Plaintiffs in Kennedy did rely on several key findings from the working files, including statistics showing how frequently applicants were represented by counsel and how frequently applicants included medical evidence of PTSD or other conditions.**

ECF 112 at 2. As of the filing of this letter, plaintiffs have not responded. If plaintiffs are citing *ex parte* communications made to the Court in the context of settlement negotiations, defendant is without knowledge of those communications, and was denied by plaintiffs the opportunity to review plaintiffs' statistical report evidence possibly cited in those communications, and cannot meaningfully respond. Permitting plaintiffs to cite their undisclosed consulting expert report in one case as evidence to support a motion in another case runs afoul of the Federal Rules' most basic mandate, that the Rules provide for the "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Next, defendant argues that the request is not proportional to the needs of the case because the burden outweighs the likely benefit. The Navy maintains working files for some applications (only going back about 3 years). The process of preparing these for production to plaintiffs' counsel is labor intensive, involving 25-30 minutes' time per application. The Navy does not maintain working files prior to 2016. The NDRB submitted a request to the National Archives and Records Administration ("NARA"), which maintains personnel files, for relevant records prior to 2016; and the Navy must then review NARA's production to extract the relevant

files to produce.[1]  This is also a labor-intensive process.  These processes will negatively impact the NDRB's ability to review petitions and grant relief for veterans.  As plaintiffs are aware from the Department of the Navy ("DON") deponent, Mr. Robert Powers, NDRB resources are limited and processing time have significantly increased since the NDRB began allowing petitioners to appear telephonically.  Since in *Kennedy*, it appears plaintiffs did not use the statistical analysis to prove any discoverable fact (any fact that is relevant to the claims or defenses at trial) or move settlement discussions forward, the benefit of producing these materials is non-existent.

Defendant also maintains critical concerns about privacy that are neither hypothetical nor abstract.  On January 28, 2020, after the NDRB Rule 30(b)(6) witness deposition ended, defense counsel discovered a binder, labeled as plaintiffs' counsel's work product, that had been left in a conference room.  At this time, the *Manker* plaintiffs' counsel were already down the hall, away from the room, and preparing to leave defense counsel's office building.[2]  In light of this event, by e-mail on February 21 and by telephone some weeks earlier, defense counsel asked plaintiffs' counsel to elaborate on the policies or procedures that the Jerome N. Frank Legal Services Organization (the "Clinic") has in place to ensure that these application records, if they are produced, are kept secure.  Plaintiffs' counsel have twice either refused or failed to respond to said inquiries.

Defendant has affirmative duties to protect personally identifiable information disclosed to it for official purposes, many items of which could be used by bad actors to compromise a private individual's present location, identity, and financial being.  Defendant's concern could be alleviated by learning the Clinic's policies and procedures or, for example, an affirmative representation that (1) the application materials will be maintained digitally on a secure, password-protected server, (2) plaintiffs' counsel and their agents will not e-mail any applications among themselves, and (3) plaintiffs' counsel and their agents will not print copies of any unredacted applications.  Until plaintiffs are willing to either describe their procedures or agree to limit the use of these applications, Navy maintains grave concerns about plaintiffs' counsel's capacity to protect the information at issue.  The applications plaintiffs seek were submitted to the government by former sailors and marines who never anticipated that a private attorney (whom they did not choose) would have access to the most intimate details contained in the applications.  These former servicemembers may or may not be relevant class members, and had and will have no opportunity to opt in or out of their records being disclosed.  Navy requests information to assure that, for example, a binder of printed, unredacted application documents will not be forgotten in a study space and left to prying eyes, or accessible to third parties not involved in this litigation.

---

[1] Plaintiffs' "concession" in ECF 112 to accept 100 working files that postdate 2016 would substantially *increase* the burden of their request to the NDRB.  At present, the NDRB would spend 10-15 hours searching and retrieving 30 applications (not including production time) that postdate 2016.  As of this filing, the NARA exceeded initial expectations concerning processing times, and has already transmitted 70 applications that predate 2016 to the NDRB.  NDRB must still review these files (that process is expected to take somewhat less than 20-30 minutes per file).  Under plaintiffs' proposal, the NDRB would spend 30-50 hours searching for only post-2016 applications between now and March 4.

[2] Defense counsel was able to return the binder immediately to Attorney Wishnie without issue, since plaintiffs' counsel had not yet left.

Lastly, the discovery of the applications is not important, or only minimally so, for resolving the issues in this case. In particular, Plaintiffs' reasons concerning the importance of the NDRB's working files are undercut by discovery that has already occurred in this case.

Plaintiffs first assert that "[a]n analysis of the underlying applications will show whether the NDRB properly screens for, identifies, and considers allegations, diagnoses, and evidence of post-traumatic stress disorder ('PTSD'), traumatic brain injury ('TBI'), military sexual trauma ('MST'), and other related mental health conditions." The NDRB, however, was not required to screen and address *all of these issues* until the Department of Defense ("DoD") issued the Kurta Memo on August 25, 2017.

Plaintiffs then assert that "[a]n analysis of the decisional documents absent the underlying applications will fail to capture several relevant criteria, such as the frequency at which the NDRB overlooks applications that allege PTSD-related symptoms and fails to apply the corresponding 'liberal consideration' standard in its decisional documents." Similar to the point above, NDRB was not required to apply the "liberal consideration" standard until Congress added subsection (d)(3) to U.S.C § 1553 on December 23, 2016. And as plaintiffs are aware, the DoD Rule 30(b)(6) witness deposed in this case, Lt. Col. Reggie Yager, U.S. Air Force, clearly and unequivocally testified that the Hagel Memo did not apply to the NDRB until the issuance of the Kurta Memo on August 25, 2017. Thus, any application files that predate 2017 are not relevant, and thus not important to the resolving the issues in this case.

Plaintiffs finally assert that "[a] review of the working files will allow Plaintiffs to compare cases in which applicants allege or provide evidence of mental health conditions with the corresponding decisional documents to determine whether the NDRB provides sufficiently reasoned denial decisions." Defendant, however, has already produced all of the decision documents to the Plaintiffs. And as plaintiffs are aware, the DON deponent testified that "**the real test on whether [the Navy is] being fair and equit[able] on these decisions is [the] written decisional document**." Out of the 100 cases identified by plaintiffs in this request, they have not identified any decisions that are deficient on their face to warrant the invasion of a veteran's privacy by obtaining his or her entire application including any sensitive and confidential medical documents.

Defendant appreciates the Court's assistance in resolving this dispute.

    Very truly yours,

    John H. Durham,
    U.S. ATTORNEY

    /s/ Natalie N. Elicker
    Natalie N. Elicker
    ASSISTANT U.S. ATTORNEY